THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALVIN C. VAN BROCKLIN, Defendant-Appellant.

Second District No. 2—96—1396

Opinion filed November 14, 1997.—Rehearing denied December 24, 1997.

Joseph Michael Williams, of St. Charles, for appellant.

Roger T. Russell, State's Attorney, of Belvidere (Martin P. Moltz and Richard S. London, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

On September 12, 1996, the jury found defendant, Alvin Van Brocklin, guilty of one count of predatory criminal sexual assault of a child (720 ILCS 5/12—14.1(a)(1) (West 1996)), in connection with an act of sexual penetration he committed against his grandson, A.S., on February 26, 1996. On October 29, 1996, the trial court sentenced defendant to 11 years' incarceration. Defendant now appeals his conviction and sentence. We affirm.

## BACKGROUND

The following summary of facts is taken from the record. Tammy Van Brocklin, A.S.'s mother and defendant's daughter, lived with defendant at his home. On February 26, 1996, Nikki Schultz, a friend of Tammy's, entered defendant's home and observed him sexually assaulting five-year-old A.S. On March 5, 1996, defendant was charged by information with one count of predatory criminal sexual assault

of a child, in violation of section 12—14.1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/12—14.1(a)(1) (West 1996)).

On June 11, 1996, pursuant to section 115—10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115—10 (West 1996)), the trial court conducted a hearing regarding the admission of hearsay testimony of A.S. Nikki Schultz testified that on February 26, 1996, she had a conversation with A.S. in the bedroom of her home. A.S. asked her "if grandpa told [Schultz] about his secrets, their secrets." She told A.S. that she knew about the secrets, even though she did not, because she believed that A.S. was hiding information. According to Schultz, A.S. then stated that he and defendant "would lick each others pee-pees [and] lick each others['] butts *** [and] [t]hat grandpa would play with his butt. [Defendant] would put his pee-pee in [A.S.'s] butt *** [and A.S.] would put his pee-pee in [defendant's] butt." Schultz testified that she did not ask A.S. questions before or during the time in which he described his activities with defendant; in other words, the information A.S. provided to her was unsolicited. After hearing A.S.'s story, Schultz called the Department of Children and Family Services (DCFS). Thereafter, with the consent of DCFS, Schultz took A.S. to the hospital.

On cross-examination, Schultz stated that A.S. was not complaining of injury, upset, or crying at the time he provided her with the "secrets." She admitted that, when she removed A.S. from defendant's home, she told him that "grandpa does naughty things." Schultz was later recalled by the State, and she testified that A.S. told her that when defendant "wouldn't cut his fingernails red stuff would come out of his butt." She admitted that A.S. provided this information in response to her question of whether defendant "ever did anything to hurt" A.S.

Martrice Williams testified that she is a child protection investigator with DCFS. On February 27, 1996, she interviewed A.S. by asking him nonleading questions so as not to put "words into the child's mouth." A.S. told Williams that at night he slept in the same bed as defendant. Williams then conducted an anatomical inventory of A.S. A.S. was able to identify his body parts, including his "pee-pee" and "butt." A.S. stated that defendant "stuck his finger up my butt." A.S. told Williams that this occurred once per day either in the shower or bedroom of his home. A.S. also told Williams that "only grandpa" treated him in this manner. A.S. indicated that defendant used his index finger to penetrate A.S.'s anus.

Williams asked A.S. whether there were any more "secrets." A.S. responded that "he licks my butt and *** my pee-pee." A.S. told Williams that "he" was "grandpa" and that "grandpa" was "Alvin." A.S.

told Williams that he also licked defendant's "pee-pee" and "butt." A.S. described defendant's "pee-pee" as "big," and his "butt" as "big and white." A.S. stated that defendant's "pee-pee" was "standing up." A.S. demonstrated his and defendant's actions on anatomical dolls provided by Williams. Finally, A.S. told Williams that he was telling the truth.

On cross-examination, Williams admitted that she did not ask A.S. about any events which had specifically occurred on February 26, 1996. However, on redirect, Williams stated that it would not be unusual for a five-year-old such as A.S. to not remember any specific dates on which he was abused; to a five-year-old, "everything happened a few minutes ago."

Detective Mark Pollock of the Belvidere police department testified that on February 28, 1996, he was present during Williams' interview of A.S. He observed the interview from an adjacent room through a one-way mirror. Pollock's testimony corroborated that of Williams, including how A.S. demonstrated licking defendant's "butt" on an anatomical doll.

At the conclusion of Pollock's testimony, the trial court determined that "the time, content, and circumstances of the statements provide sufficient safeguards of reliability." The trial court therefore ordered that A.S.'s hearsay statements, as offered by Schultz, Williams, and Detective Pollock, would be admitted as evidence under section 115—10(b)(1) of the Code (725 ILCS 5/115—10(b)(1) (West 1996)).

On September 9, 1996, the trial court held a hearing pursuant to section 106B—5 of the Code (725 ILCS 5/106B—5 (West 1996)) in order to determine whether A.S. could testify at trial via closed circuit television. Martrice Williams opined that, based on her contact with A.S., "it would be very stressful" for him to testify in front of defendant because he would likely believe that he was betraying defendant for revealing their "secrets." As a result, A.S. would not be able to reasonably communicate if he were forced to testify in open court. The trial court found that A.S. "would in fact suffer serious emotional distress such that he [could not] even communicate" if he testified in open court. Accordingly, the trial court allowed the State to take A.S.'s trial testimony outside the courtroom via closed circuit television.

When trial commenced on September 10, 1996, A.S. was the first witness to testify. While A.S. testified in a conference room, defendant and the jury observed A.S.'s testimony on monitors in the courtroom. Defendant was able to communicate with his attorney via a secured telephone line. A.S. stated that he is six years old, attends

kindergarten, is able to count to five, and remembers the previous Christmas. A.S. was able to identify various body parts, including a hand, arm, knee, "belly," "butt," and "pee-pee." A.S. stated that he was able to differentiate between telling the truth and telling a lie. He indicated that "it's bad to tell a lie" and "good" to tell the truth. A.S. then testified that defendant touched him "[i]n the butt" in the bedroom of defendant's home. Defendant used his index finger and was the only person to touch A.S. in this manner.

On cross-examination, A.S. stated that "[o]nly grandpa" has ever hurt him. A.S. further testified that he likes his "dada," whom he identified as "J.R." J.R. never told A.S. that defendant was "doing bad things" to him. A.S. explained that he used to take showers with defendant, but he does not do so anymore.

Nikki Schultz testified that she had been to defendant's home over a hundred times prior to February 26, 1996, because her boyfriend, Denzil Radabaugh, lived there. Radabaugh is defendant's stepson. On February 23, 1996, Schultz made arrangements with Tammy to baby-sit Tammy's children, including A.S., while Tammy went to Florida. Defendant was present while Schultz and Tammy made their arrangements; he volunteered to watch A.S. over the weekend.

On the morning of February 26, 1996, Schultz arrived at defendant's home to take A.S. to school. Defendant told Schultz that he would pick up A.S. from school and that Schultz should return for A.S. at 2:30 p.m. When Schultz arrived at defendant's home at approximately 1:45 p.m., she knocked on the door but there was no answer. Although she had keys to the house, the door was unlocked. She walked into the house and called for A.S. or defendant. She heard no response. Because she needed to use the rest room, she proceeded in that direction.

Once she opened the bathroom door, she observed A.S.'s and defendant's clothing on the floor. She looked into the mirror, which was directly across the room from the bathtub, and saw defendant "looking downward" while he was in the bathtub. Because of a divider between the bathtub and Schultz' position, defendant was initially unable to see her. Schultz then looked into the bathtub and saw defendant's "left hand on [A.S.'s] buttocks and his left thumb penetrating [A.S.'s] buttocks, anus, and also, he, with his right hand, he was stroking his penis." Schultz was able to observe that defendant's thumb was inside A.S.'s anus "past the first knuckle." Schultz then called defendant a "sick son of a bitch," pushed him back into the faucet, and pulled A.S. out of the bathtub. She then told A.S. that "everything [was] going to be okay."

As she dressed A.S., defendant was "pleading" with her, saying, "don't tell Tammy I'll do anything you ask me to." She took A.S. outside to Tammy's vehicle and drove him to her home in Rockford. During the ride, she did not talk to A.S because she was crying. Upon their arrival in Rockford, she cooked dinner for A.S. but did not speak to him about what she had previously observed. Later in the evening, in her bedroom, A.S. asked her if defendant had told her about "all their secrets." She responded "yes." A.S. then told her that he was "not supposed to tell anybody about them." Schultz asked A.S. whether defendant "made him do things that he didn't want to do." A.S. told her that "when [defendant] doesn't cut his fingernails it hurts his butt and red stuff comes out." A.S. then also told her that he and defendant would lick each other's "butts" and "pee-pees." When they would sleep together, defendant would make A.S. "put [his] butt up in the air and [his] face in the pillow and [defendant] would stick his pee-pee in [his] butt." Thereafter, Schultz contacted DCFS and eventually spoke to Martrice Williams. On February 27, 1996, Schultz took A.S. to a hospital in Rockford where he was examined. Schultz testified that during A.S.'s rectal examination, she "saw a huge hole and *** saw the boy's colon." Finally, Schultz testified that, during the previous year, defendant and A.S. showered together every day and slept in the same bed every night. Schultz also admitted that she has two prior felony convictions, one for deceptive practices and the other for theft of property in excess of $300.

On cross-examination, Schultz reiterated that, on the ride from defendant's home to her home on February 26, 1996, both she and A.S. were crying. However, she admitted that, in her previous testimony at the section 115—10 hearing on June 11, 1996, she stated that she and A.S. had a conversation in the car. She also admitted that in her previous testimony she indicated that A.S. neither complained of injury nor cried during their ride to Rockford.

Martrice Williams testified that she interviewed A.S. on February 27, 1996. Her testimony mirrored that which she provided at the section 115—10 hearing on June 11, 1996.

Detective Mark Pollock of the Belvidere police department testified that he witnessed Williams' interview of A.S. on February 27, 1996. His testimony also mirrored that which he provided at the prior section 115—10 hearing.

Tammy Van Brocklin testified that she is A.S's mother and defendant is her father. They, along with Tammy's stepsiblings, all lived together in defendant's home. She stated that defendant and A.S. bathed together once per day. From April 1994 until February

1996, A.S. slept with defendant in defendant's bed. During the summer of 1995, A.S. began having trouble controlling his bowel movements.

Dr. Bernard Binger testified that he specializes in emergency medicine and that he examined A.S. on February 27, 1996. Dr. Binger noted that there was no evidence of injury to A.S.'s buttocks. However, A.S.'s external and anal sphincters "were very relaxed." This reaction was consistent with someone who "had multiple times of anal penetration." Dr. Binger also observed a "gaping," or much larger expansion, of A.S.'s anus. Due to the larger than normal opening, Dr. Binger was able to observe the "distal end of the large bowel." It was "grossly abnormal" for Dr. Binger to be able to make such an observation. Dr. Binger had never seen such gaping in a five-year-old child.

Tammy Van Brocklin was recalled on defendant's behalf and testified that A.S. had never said that he was sexually abused by anyone other than defendant. Sometime prior to May 20, 1996, Tammy, A.S., and Tammy's mother had a telephone conversation. At that time, A.S. told Tammy's mother that "grandpa didn't do it." However, he immediately turned to Tammy and told her that "he was just joking." Tammy stated that her boyfriend, J.R., had lived with her and A.S. at defendant's home from August 1992 until April 1994. She denied that A.S. had ever viewed any sexually explicit material or observed Tammy and J.R. engaged in sexual conduct.

On cross-examination, Tammy explained that J.R.'s name is Fred Sosnowski. Between April 1994 and February 1996, Sosnowski did not live with Tammy and A.S. A.S. now lives with Tammy and Sosnowski and his previous difficulties with controlling his bowel movements are improving. Tammy's mother told A.S. on the telephone that a psychic told her that defendant "didn't do it *** and [the psychic] mentioned J.R.'s name."

Defendant testified on his behalf. He explained that in February 1996, A.S. lived with him in his home. J.R. visited on weekends and had previously lived with them for about three years. According to defendant, Nikki Schultz was only in his home a couple of times prior to February 1996. Defendant admitted that he often slept with A.S. While Tammy was in Florida in February 1996, defendant watched A.S. during the day while Schultz cared for him at night.

On Monday, February 26, 1996, Schultz arrived at defendant's home at about 1:50 p.m. According to defendant, all that occurred was a brief discussion about whether he had had sex with anyone since his divorce. After the conversation, defendant drove Schultz, in Tammy's car, to A.S.'s school in order to show her its location. Defen-

dant next spoke to Schultz on Tuesday, February 27, when he asked her whether she had taken A.S. to school. Schultz told defendant that A.S. did not feel well and did not want to go to school. Schultz "then proceeded to tell [defendant] that she had gotten [A.S.] to say bad things about [defendant]." Defendant denied that anything of a sexual nature had ever occurred between him and A.S. either in the shower or in his bedroom.

According to defendant, on February 22, 1996, A.S. awakened him and told him that "J.R. was doing things to him that he shouldn't be." A.S. then left the bedroom to tell Tammy about J.R. Defendant heard J.R. say "grandpa done it." A.S. returned to the bedroom shortly thereafter, crying and holding a bloody paper towel because J.R. had punched him in the mouth. A.S. told defendant that "J.R. was making [A.S.] lick J.R.'s pee-pee and J.R.'s butt." Defendant also denied telling Radabaugh that he had masturbated after he showered with A.S.

On cross-examination, defendant explained that someone "coached" A.S. to implicate him in this case. He also said that Radabaugh was lying about defendant's alleged masturbation after showering with A.S. Defendant stated that if Schultz had been in his home almost daily, it must have been while he was at work because he only met her about three times. Defendant stated that he has not had sex in the 22 years since his divorce and has had no female companionship in that time.

On September 12, 1996, the jury found defendant guilty of predatory criminal sexual assault of a child. On October 29, 1996, the trial court sentenced defendant to a term of 11 years' imprisonment.

I

Defendant's first contention on appeal is that he was not proved guilty beyond a reasonable doubt of predatory criminal sexual assault of a child (see 720 ILCS 5/12—14.1(a)(1) (West 1996)). In support of this contention, defendant offers three principal arguments: (1) the evidence was insufficient to prove that he committed the charged offense; (2) the testimony of A.S. and Nikki Schultz was not sufficient to sustain his conviction; and (3) the testimony of Martrice Williams and Detective Pollock was similarly insufficient to support his conviction.

■ Our standard of review on a challenge to the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Schott*, 145 Ill. 2d 188, 202-03 (1991); *People v. Collins*, 106 Ill. 2d 237,

261 (1985). The reasonable doubt standard applies whether the evidence presented of defendant's guilt is direct or circumstantial. *People v. McDonald*, 168 Ill. 2d 420, 444 (1995). This court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *People v. Tharpe-Williams*, 286 Ill. App. 3d 605, 611 (1997). The same rule applies regarding the credibility of child witnesses. *People v. Willer*, 281 Ill. App. 3d 939, 949 (1996) (issue of child witness' credibility one for trier of fact). A conviction will not be overturned unless the evidence is "so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Campbell*, 146 Ill. 2d 363, 375 (1992); *Collins*, 106 Ill. 2d at 261. It is well settled that the testimony of a single witness, if positive and credible, is sufficient to support a conviction. *People v. Grano*, 286 Ill. App. 3d 278, 290 (1996).

■ Further, "[c]ircumstantial evidence is sufficient to sustain a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *Campbell*, 146 Ill. 2d at 379. It is not necessary that each link in the chain of circumstantial evidence be proved beyond a reasonable doubt. *McDonald*, 168 Ill. 2d at 444; *People v. Irby*, 237 Ill. App. 3d 38, 58 (1992). Rather, it is sufficient if the evidence as a whole satisfies the trier of fact of the defendant's guilt beyond a reasonable doubt. *McDonald*, 168 Ill. 2d at 444.

■ Defendant was charged with predatory criminal sexual assault of a child, in violation of section 12—14.1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/12—14.1(a)(1) (West 1996)). To establish a violation of section 12—14.1(a)(1), the State had to prove, beyond a reasonable doubt, that on February 26, 1996, defendant was "17 years of age or over and commit[ted] an act of sexual penetration with a victim who was under 13 years of age when the act was committed." 720 ILCS 5/12—14.1(a)(1) (West 1996). We note that there are no reported decisions under this statute. Section 12—14.1 became effective on December 13, 1995, as part of Public Act 89—428, was recodified in Public Act 89—462, and became effective on May 29, 1996. See *Johnson v. Edgar*, 176 Ill. 2d 499, 503, 509-10 (1997). This lack of precedent however, is not an impediment to our decision in this case.

■ Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found defendant guilty of predatory criminal sexual assault of a child. See *Schott*, 145 Ill. 2d at 202-03; *Collins*, 106 Ill. 2d at 261. A.S. testified that defendant routinely penetrated him anally both with his fingers and with his penis. In fact, A.S. stated that defendant played with A.S.'s "butt"

every day. Several witnesses, including A.S., Schultz, and Radabaugh, testified that defendant and A.S. slept and showered together daily; defendant admitted that he often slept with A.S. Medical evidence, as testified to by Dr. Binger, supports the conclusion that A.S. was repeatedly penetrated anally. It is true, as defendant notes, that A.S. did not testify to any specific abuse perpetrated by defendant on February 26, 1996. However, a rational trier of fact could infer that, based on A.S.'s testimony of defendant's daily abuse and other corroborating circumstantial evidence, defendant anally penetrated A.S. on February 26, 1996. See *McDonald*, 168 Ill. 2d at 444.

Any doubt as to whether the State adequately proved the date of the charged offense was resolved by Nikki Schultz. Schultz testified that on February 26, 1996, she observed defendant and A.S. in defendant's bathtub and watched defendant penetrate A.S.'s anus with his thumb. By itself, Schultz' testimony is sufficient to sustain defendant's conviction. See *Grano*, 286 Ill. App. 3d at 290. Although she was impeached by her prior convictions, the jury was well aware of these convictions when it found defendant guilty. We will not second guess the jury's determinations as to the credibility of witnesses. See *Tharpe-Williams*, 286 Ill. App. 3d at 611. As such, defendant was proved guilty beyond a reasonable doubt of predatory criminal sexual assault of A.S. stemming from the February 26, 1996, incident.

## II

Defendant's second contention is that section 106B—5 of the Code (725 ILCS 5/106B—5 (West 1996)), commonly known as the Child Shield Act, is unconstitutional. According to defendant, the statute violates the confrontation clause of the sixth amendment to the United States Constitution (confrontation clause) (U.S. Const., amend. VI) because it fails to explicitly require that a defendant "cause the trauma" which necessitates a child witness' closed circuit television testimony. In the alternative, defendant raises several evidentiary issues which involve the trial court's use of the Child Shield Act and which he argues necessitate a reversal.

## A

Defendant's primary argument with respect to this contention is that the Child Shield Act is unconstitutional because it violates the confrontation clause and the principles set forth by the Supreme Court in *Maryland v. Craig*, 497 U.S. 836, 111 L. Ed. 2d 666, 110 S. Ct. 3157 (1990). The State responds initially that defendant has waived this argument for our review.

■ It is well settled that objections both at trial and in a posttrial

motion are necessary to preserve an issue for appellate review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *Tharpe-Williams*, 286 Ill. App. 3d at 609. Although defendant failed either to object at trial to the Child Shield Act's constitutionality or raise the issue in his posttrial motion, we decline to apply waiver in this case. See *People v. McCoy*, 281 Ill. App. 3d 576, 585 (1996) (waiver limits the parties, not the court). Given the significance of a criminal defendant's right "to be confronted with the witnesses against him" (U.S. Const., amend VI; *Coy v. Iowa*, 487 U.S. 1012, 1015, 101 L. Ed. 2d 857, 863, 108 S. Ct. 2798, 2800 (1988)), we will address the merits of defendant's contention.

## 1

■ In *Maryland v. Craig*, 497 U.S. 836, 111 L. Ed. 2d 666, 110 S. Ct. 3157 (1990), the Court examined the constitutionality of a Maryland statute that permitted an alleged child victim of sexual abuse to testify via closed circuit television. The Maryland statute allowed such testimony to be taken if the trial court "determines that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate." Md. Code Ann., Cts. & Jud. Proc. § 9—102(a)(1)(ii) (1989). The statute at issue allowed the child's testimony to be taken during trial, in the presence of the prosecuting attorney and defense counsel, while the defendant and the trial judge remained in court with the jury. Md. Code Ann., Cts. & Jud. Proc. §§ 9—102(b)(1)(i), (b)(1)(ii), (b)(2) (1989). Finally, the Maryland statute allowed the trial court and the defendant to communicate by "appropriate electronic method" with those in the room where the child was testifying. Md. Code Ann., Cts. & Jud. Proc. § 9—102(b)(3) (1989).

The Court began by noting that the confrontation clause does not guarantee criminal defendants the "*absolute* right to a face-to-face meeting with witnesses against them at trial." (Emphasis in original.) *Craig*, 497 U.S. at 844, 111 L. Ed. 2d at 677, 110 S. Ct. at 3163. Rather, the confrontation clause ensures "the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Craig*, 497 U.S. at 845, 111 L. Ed. 2d at 678, 110 S. Ct. at 3163. It is the

> "combined effect of these elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—[which] serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Craig*, 497 U.S. at 846, 111 L. Ed. 2d at 678-79, 110 S. Ct. at 3163.

The Court recognized that Maryland's statute prevented the child witness from seeing the accused when she testified at trial. *Craig*, 497 U.S. at 851, 111 L. Ed. 2d at 682, 110 S. Ct. at 3166. However, the statute

> "preserves all of the other elements of the confrontation right: The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies." *Craig*, 497 U.S. at 851, 111 L. Ed. 2d at 682, 110 S. Ct. at 3166.

Thus, the Court held that, because the Maryland statute provided for "oath, cross-examination, and observation of the witness' demeanor," it satisfied the confrontation clause despite its merely functional equivalent to live, in-person testimony. *Craig*, 497 U.S. at 851, 111 L. Ed. 2d at 682, 110 S. Ct. at 3166.

The Court then examined whether the Maryland procedure was necessary to further an important state interest. The Court held that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Craig*, 497 U.S. at 853, 111 L. Ed. 2d at 683, 110 S. Ct. at 3167. However, "[t]he requisite finding of necessity must of course be a case-specific one: The trial court must hear evidence and determine whether use of the one-way closed circuit television is necessary to protect the welfare of the particular child witness who seeks to testify." *Craig*, 497 U.S. at 855, 111 L. Ed. 2d at 685, 110 S. Ct. at 3169. Additionally, a trial court had to determine that the child witness "would be traumatized, not by the courtroom generally, but by the presence of the defendant." *Craig*, 497 U.S. at 856, 111 L. Ed. 2d at 685, 110 S. Ct. at 3169. The Court declined to enunciate the minimum standard of emotional trauma necessary to trigger the closed-circuit procedure; however, the Maryland statute clearly satisfied constitutional standards because it required that a child witness suffer " 'serious emotional distress such that the child cannot reasonably communicate.' " *Craig*, 497 U.S. at 856, 111 L. Ed. 2d at 685, 110 S. Ct. at 3169, quoting Md. Code Ann., Cts. & Jud. Proc. § 9—102(a)(1)(ii) (1989). Thus, "[s]o long as a trial court makes such a case-specific finding of necessity, the Confrontation Clause does not prohibit a State from using a one-way closed circuit television procedure for the receipt of testimony by a child witness in a child abuse case." *Craig*, 497 U.S. at 860, 111 L. Ed. 2d at 688, 110 S. Ct. at 3171.

2

■ The Child Shield Act (725 ILCS 5/106B—5 (West 1996)) is

nearly identical to the Maryland statute upheld in *Craig*. Like the Maryland statute, the Child Shield Act provides that a trial court may take the testimony of a child witness in a child abuse case if the testimony is "taken during the proceeding" and if the trial court "determines that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate." 725 ILCS 5/106B—5(a)(1), (a)(2) (West 1996). Neither the Maryland statute nor the Child Shield Act expressly requires that a defendant, and not the courtroom generally, cause a child witness' emotional distress. Under the Child Shield Act, only the prosecuting attorney, defense counsel, and the trial court may question the child witness. 725 ILCS 5/106B—5(b) (West 1996). Finally, during the child witness' testimony, the defendant remains in the courtroom, in the presence of the jury, if one is sitting (725 ILCS 5/106B—5(e) (West 1996)), and is allowed to communicate with persons in the room where the child is testifying "by any appropriate electronic method" (725 ILCS 5/106B—5(f) (West 1996)).

As is now obvious, the Child Shield Act is almost identical to the Maryland statute. Compare 725 ILCS 5/106B—5 *et seq.* (West 1996) with Md. Code Ann., Cts. & Jud. Proc. § 9—102 *et seq.* (1989). The statutes mirror each other in every significant provision. This alone, however, does not give the Child Shield Act a free constitutional pass. What allows the Child Shield Act to pass constitutional muster is its totality. In child abuse cases in Illinois, a child witness testifies under oath, is subject to contemporaneous cross-examination, and must testify under the watchful eyes of the parties and the fact finder. In sum, the Child Shield Act provides for "oath, cross-examination, and observation of the witness' demeanor," despite the confrontation clause's preference for live, in-person testimony. See *Craig*, 497 U.S. at 851, 111 L. Ed. 2d at 682, 110 S. Ct. at 3166. The Child Shield Act also provides for a "case-specific finding of necessity" by the trial court before a child witness' testimony can be taken outside the view of the accused. See *Craig*, 497 U.S. at 860, 111 L. Ed. 2d at 688, 110 S. Ct. at 3171. The Child Shield Act thus comports with those principles enunciated by the *Craig* Court and thereby satisfies the confrontation clause of the sixth amendment to the United States Constitution (U.S. Const., amend. VI).

■ Defendant's argument that the Child Shield Act is unconstitutional because it does not expressly state that a defendant "cause the trauma" which necessitates the closed circuit testimony process is therefore misplaced. Neither the Maryland statute nor the Child Shield Act contains such language. Both are still constitutional. Such

language is not a statutory requirement. Rather, according to the Supreme Court, it is the duty of the trial court to ensure that a child's emotional trauma is caused by the presence of the defendant and not by the spectacle of the courtroom. *Craig*, 497 U.S. at 856, 111 L. Ed. 2d at 685, 110 S. Ct. at 3169. As will be discussed below, the trial court in this case made the appropriate inquiry as required by the *Craig* Court. Even if this inquiry had not been made, we would still hold that the Child Shield Act passes constitutional muster.

## B

In the alternative, defendant argues that the trial court erred in allowing A.S. to testify via closed circuit television because the State failed to show that such a procedure was necessary. According to defendant, the testimony of Martrice Williams was insufficient to justify the infringement on his confrontation clause rights.

On September 9, 1996, the trial court conducted a hearing pursuant to section 106B—5 of the Code (725 ILCS 5/106B—5 (West 1996)). Williams testified that, if A.S. were to testify in front of defendant, he would believe that he was betraying defendant because he would be revealing their "secrets." In answer to the prosecutor's question, Williams opined that, if he were forced to testify in front of defendant, A.S. could "suffer such emotional distress that he would be unable to reasonably communicate." Defendant put forth no evidence, expert or otherwise, to contradict Williams' testimony. The trial court found that A.S. "would in fact suffer serious emotional distress such that he [could not] even communicate" if he were forced to testify before defendant. As such, the trial court allowed the testimony of A.S. to be taken via one-way closed circuit television, consistent with the procedures enunciated in the Child Shield Act (725 ILCS 5/106B—5 (West 1996)).

We find no error in the trial court's actions. The trial court conducted a case-specific inquiry and determined that the interest in protecting A.S. from the emotional abuse he would suffer from testifying before defendant outweighed defendant's right to observe A.S. in open court. See 725 ILCS 5/106B—5(a)(2) (West 1996). The trial court based its decision on the uncontradicted testimony of Williams that A.S. would indeed suffer severe emotional abuse such that he would be unable to even reasonably communicate. Nothing in the record contradicts Williams' opinion. Thus, the Child Shield Act was constitutionally applied to defendant.

# CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Boone County is affirmed.

Affirmed.

GEIGER, P.J., and INGLIS, J., concur.