THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DUANE McCOY, a/k/a Parris McCoy, Defendant-Appellant.

First District (1st Division)   No. 1—94—1960

Opinion filed June 3, 1996.

Rita A. Fry, Public Defender, of Chicago (Cheryl K. Lipton, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Timothy Felgenhauer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

Sixteen-year-old James Earl Fleming was shot at 7:50 a.m. on July 20, 1991, as he lounged on a parked car with his friends, Arthur James and Londell Lancaster, outside Arthur's home at 1306 N. Harding in Chicago. Fleming died from three gunshot wounds to the head and neck.

Duane (Parris) McCoy, age 19, was charged with Fleming's murder. A jury found him guilty. He was sentenced to 80 years in prison. In this appeal he raises issues relating to his claim that he was drinking alcohol and ingesting drugs during the hours before the shooting.

He also challenges the length of his sentence. We affirm the conviction and sentence.

## BACKGROUND

This was not a crime of passion. There was no fight. No harsh words were exchanged. Fleming died for one reason—he was a member of the Gangster Disciples. His killer was a member of a rival gang, the Insane Unknowns. Someone had "to pay" for the death of Jesse Maldonado, an Insane Unknowns gang member who had died a similar senseless death some months earlier. Fleming became that someone.

There were witnesses to the shooting. Based on their description of the shooter, Duane McCoy was arrested shortly after the shooting and charged with Fleming's murder. At the police station he was identified in a lineup. He later gave a self-incriminating statement to police.

In 1994, McCoy was tried by a jury on the murder charge. Jacob Camacho (Camacho) testified as a State witness. He said that in July 1991 he had been a member of the Insane Unknowns. Since that time he married, had children, and joined the United States Army.

Camacho testified that at about 7 o'clock in the morning on July 20, 1991, he met with McCoy and several other Insane Unknowns gang members at one of the regular meeting places, an apartment at the corner of Potomac and Karlov Streets. They met there that day because it was the birthday of a fellow gang member, Jesse Maldonado (known as Bingo), who had died. They mourned his death and planned to place a wreath on his grave that day.

While at this apartment, Camacho saw McCoy (known as Woo Woo) sniff some cocaine. Shortly after taking the cocaine, McCoy stated he was going to "get one for Bingo."

Later, Camacho saw McCoy leave the apartment and walk eastward toward Pulaski Avenue in the direction of the Black Gangster Disciples territory. Camacho followed and tried to persuade McCoy to "not do anything stupid, to come back." But McCoy refused. McCoy repeated that he had to "get one for Bingo." Camacho saw that McCoy had a gun inside the waistband of his shorts. Despite Camacho's repeated efforts to dissuade McCoy, McCoy continued to walk east on Potomac, then north on Harding Street. Camacho stopped following once McCoy turned onto Harding. From the corner of Harding and Potomac, Camacho witnessed McCoy shoot Fleming.

Camacho testified that he ran as soon as he heard the first shot. He ran back to the apartment and told the others what had hap-

pened. Camacho wanted to leave but was forced to stay due to threats made by the others.

McCoy returned to the apartment. A short time later the police came to the apartment and found Camacho and McCoy hiding in the bathroom, inside the bathtub. Everyone was taken to the police station and Camacho told the police what he saw.

Barney Jones, who lived at 1306 N. Harding, and Londell Lancaster, who had been sitting on the car with Fleming, testified at trial. They both witnessed the shooting.

Jones said that he saw a young man in a Bulls shorts outfit approach the car where Fleming and the others were sitting. After a brief exchange of words, the young man pulled out a gun and started shooting. Fleming was hit and fell to the ground. The shooter stepped up and shot Fleming again in the head, at close range, as Fleming lay on the ground. Jones watched as the shooter ran off toward Pulaski Avenue.

Lancaster also testified that the shooter wore a Bulls shorts outfit. He said that the shooter walked up to the group of guys sitting on a car and asked if they had any "Bo" (marijuana). Then, for no reason, the young man pulled out a gun and started firing shots.

Both Jones and Lancaster identified McCoy as the shooter in the lineup conducted at the police station on July 20, 1991.

Officer Gregory Bella explained how the police were able to locate McCoy so quickly. He testified that he and his partner, Officer Saenz, had been on patrol in the area of N. Karlov at about 3 a.m. on July 20, 1991. He knew that July 20 was the birthday of Jesse Maldonado, a gang member who had been shot a few months earlier, because a mural had been painted on a building in the area. The mural depicted a big heart, said "Rest in Peace," and indicated Maldonado's birthday. Fearing that someone might seek retribution for the death, Officer Bella stopped and spoke with a number of Insane Unknowns outside 1250 N. Karlov. He saw McCoy there. McCoy was dressed in a shorts and top set that was white with red pinstripes. He had on a Bulls baseball cap.

After talking with six or seven gang members on Karlov Street, Officer Bella and his partner drove to Harding Street and saw 9 or 10 Gangster Disciples in the area of 1306 N. Harding. The officers stopped and spoke with them. Fleming was among these gang members.

At 7:50 a.m. Officer Bella monitored a police call regarding a man shot at 1306 N. Harding. He immediately drove to that location and obtained a description of the shooter. Based on the description he received, Officer Bella went to 1250 N. Karlov. He knocked on the

door to the downstairs apartment and was allowed entry. He found several gang members sleeping on the floor of the front room and bedroom. When he checked the bathroom, the shower curtain was drawn closed. He pulled back the curtain and found Camacho and McCoy hiding in the tub. They were taken from the bathroom and handcuffed.

Based on information received during the investigation, Bella and two other officers went to the upstairs apartment, searched the apartment, and recovered a handgun. All the gang members in the apartment were transported to the police station. Camacho and McCoy were transported separately.

Three State witnesses from the Chicago Police Crime Lab testified. Officer Fujara testified that, at the police station, he took swab samples of McCoy's hands to test for gunshot residue (GSR). Bernadette Kwak tested the samples. She testified that the tests showed a positive result for the presence of lead, antimony, and barium, suggesting that McCoy had fired or handled a gun recently. Treacy, a firearm evidence technician, testified that he performed a comparison test on the recovered handgun and bullets found at the scene. The results indicated that the recovered bullets had been fired from the handgun, to the exclusion of all others.

Detective Boyle and Assistant State's Attorney McKay testified regarding statements made by McCoy at the police station after he was informed of his *Miranda* rights. McKay was allowed to publish to the jury the contents of a signed, written statement. In his written statement, McCoy told how the memory of Bingo saddened him. He left 1250 N. Karlov and walked toward Pulaski and Division, stopping to buy a candy bar at the gas station. At 1306 N. Harding he saw several men standing by a car. He asked them if they had any "Bo," which meant marijuana. When the men just stared at him, he pulled out his gun and fired four times. Then he fled. No one told him to do the shooting, no one helped.

Defense counsel presented several witnesses. McCoy's long-time friend and fellow gang member, Ramon Rentas (known as Cuckoo), testified that he arrived at the 1250 N. Karlov apartment around 12 a.m. on July 20, 1991. He said he went there with several other Insane Unknowns, including Camacho. McCoy was already there.

Rentas testified that everyone was drinking "a couple beers and stuff," but he did not see anyone taking narcotics. Sometime after 7 a.m. the next morning, the police arrived at the apartment. Everyone had been sleeping on the floor and was awakened by the police. When the police arrived, he said, McCoy was in the living room. Only Camacho was in the washroom.

Another defense witness was Mary Palumbo. She had lived in the upstairs apartment at 1250 N. Karlov with her two children. She testified that McCoy came to her apartment late in the evening on July 19, 1991. After midnight, Cuckoo, Sinbad, Alonzo, and Camacho arrived. She testified that she saw McCoy sniff some cocaine while he was in her apartment, before Camacho arrived.

The group of friends stayed in her apartment, she said, until 4 a.m., when she told them to leave so she could put her children to sleep. When the group left, they went downstairs to another apartment.

According to Palumbo's testimony, at about 8 a.m., Camacho came running into her apartment, out of breath. He ran into her children's bedroom, stayed there a short while, and then left the apartment. Later, about 9:30 or 10 a.m., the police arrived. An officer told her that there had been a shooting and that they had "to get something from the room *** the gun was placed in my house." The officers, she said, went right to her children's room and took the gun out of the closet.

McCoy testified in his own defense. He said that he arrived at 1250 N. Karlov at 11 p.m. on July 19, 1991, but that he went to the downstairs apartment first. When he went upstairs to Mary's apartment, he went with all of his friends.

According to McCoy, he began sniffing cocaine and drinking while in Mary's apartment. At about 3 a.m., he went outside with some friends to talk with some girls. After talking to the girls, he and some of the others decided to shoot a gun off into the air. It was Orlando's gun, he said, and Orlando put it away somewhere after everyone took a turn shooting the gun. The police came by after they shot the gun in the air. An officer searched everyone, talked with them, and then left.

At 4 a.m. Mary told everyone to leave her apartment. McCoy said that he had taken so much cocaine that he had to be helped downstairs by the others. He said that he took cocaine "all morning." He also testified that, when he takes cocaine, he "blinks out." This means that he falls asleep, he explained.

According to McCoy's testimony, the next thing he remembered after going downstairs was being awakened by the police officers on the morning of July 20, 1991, at about 8 o'clock. He remembered being arrested, handcuffed, and taken to the police station. He couldn't remember anything that happened at the station, he said. He didn't remember being in the lineup or talking with the detective and State's Attorney. He didn't remember making a statement or signing it.

McCoy denied shooting Fleming. He said he knew he didn't shoot anyone "because I know I was in the house."

The jury found McCoy guilty as charged. He was sentenced to serve an extended term of 80 years' imprisonment for the murder conviction.

## OPINION

### Funds to Secure an Expert

McCoy contends that, as an indigent defendant, he was entitled to funds to retain an expert witness. He claims an expert was necessary to his "possible" affirmative defense of voluntary intoxication. The denial of his request for funds, he says, denied him a fair trial.

The State contends that McCoy established neither his indigence nor the necessity of the expert. We agree.

■ It is well established in Illinois that, under certain circumstances, an indigent defendant's constitutional protections may be violated by the denial of funds to secure an expert witness. *People v. Lawson*, 163 Ill. 2d 187, 644 N.E.2d 1172 (1994). Recently, our supreme court told us when an indigent defendant's request for funds must be honored. In *People v. Keene*, 169 Ill. 2d 1, 7, 660 N.E.2d 901 (1995), the court said:

> "As a matter of Illinois constitutional jurisprudence, the protections are triggered when the expertise sought goes 'to the "heart of the defense." ' *** The touchstone, however, is not with what is useful, helpful, valuable, or even important to the defense effort but what is 'crucial' to it."

For example, in *Ake v. Oklahoma*, 470 U.S. 68, 82-83, 84 L. Ed. 2d 53, 65-66, 105 S. Ct. 1087, 1095-96 (1985), the court found it would be fundamentally unfair to deny an indigent defendant's request for funds to secure a competent psychiatrist when the defendant's sanity at the time of the offense was to be a "significant factor" at trial.

McCoy was charged with first degree murder in that he knowingly and intentionally killed Fleming, or that he knew the gunshots would create a strong probability of death or great bodily harm to Fleming. 720 ILCS 5/9—1(a)(1), (a)(2) (West 1992).

For voluntary intoxication to be a defense, defendant would have to show that his intoxication had been so extreme that it suspended the power of reason so that the requisite intent was unable to be formed. *People v. Redmond*, 265 Ill. App. 3d 292, 302, 637 N.E.2d 526 (1994).

The statute provides:

> "A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition:

(a) Is so extreme as to suspend the power of reason and render him incapable of forming a specific intent which is an element of the offense." 720 ILCS 5/6—3(a) (West 1992).

Defense counsel requested funds to have McCoy examined by an expert to explore the "possibility" of raising the defense of voluntary intoxication. His motion asked for "funds which would be available for [an expert] to evaluate and then determine whether or not there is a reason for [the expert] to testify in this matter."

The trial judge said he was in a dilemma because McCoy was being represented by private counsel. The judge suggested that the Psychiatric Institute be contacted to determine whether that facility was competent to perform the type of examination that defense counsel sought, that is, to determine the effects of drug intoxication on mental state. If the Institute was not capable of making such a determination, the judge said, he would reconsider the request.

The Institute was able to perform the evaluation and, in fact, examined defendant. We do not know what that examination revealed. We do know that defense counsel subsequently moved to bar any use of the results of the examination. The trial court granted this request.

Some months later, defendant filed a motion to reconsider. He asked that funds be granted for an evaluation by an expert other than the Psychiatric Institute. The Institute, he said, was not impartial and his family could not afford to procure an expert. No affidavit of indigence was filed. No facts to support a finding of indigence were presented. In addition, the defendant never made a pretrial offer of proof establishing a factual need for expert testimony.

■ Under these circumstances, we find that defendant made no threshold showing that he was indigent or that expert testimony would be crucial to his defense. See *People v. Evans*, 271 Ill. App. 3d 495, 500, 648 N.E.2d 964 (1995).

McCoy's constitutional rights were not violated when funds were not provided to him to secure an expert witness.

Voluntary Intoxication Instruction

McCoy complains that the trial court denied him the opportunity to have the jury consider his defense by refusing to instruct the jury on voluntary intoxication.

Defendant did not rely on the voluntary intoxication defense. McCoy testified that he ingested alcohol and cocaine during that morning, causing him to "blink out" and fall asleep. He testified that he did not leave the apartment and was awakened only when the police arrived. He disclaimed culpability for the shooting and attempted to

divert blame to Camacho, who testified that McCoy had set out to avenge Bingo.

■ There was not enough evidence to support the giving of the instruction. McCoy failed to present any evidence that his intoxication was "so extreme as to suspend the power of reason and render him incapable of forming the specific intent which is an element of the offense." 720 ILCS 5/6—3(a) (West 1992); *People v. Redmond*, 265 Ill. App. 3d 292, 302, 637 N.E.2d 526 (1994).

Although McCoy testified at trial that he did not remember making a statement to the police after his arrest, his memory was selective. There was ample evidence that McCoy was coherent and not under the influence of drugs when he gave an inculpatory statement to police after his arrest. Other courts have held that a defendant may not rely on the defense of voluntary intoxication if he admits remembering the offense (*People v. Madej*, 106 Ill. 2d 201, 216, 478 N.E.2d 392 (1985)), and that by giving a confession to the police, one implicitly admits remembering the crime (*United States ex rel. Shepherd v. Welborn*, 848 F. Supp. 1379 (N.D. Ill. 1994)).

The police arrived at the apartment minutes after the shooting. McCoy remembered the police coming to the apartment, handcuffing him, and taking him to the police station. McCoy claimed that he could not remember making the incriminating statements to the police. But the State presented evidence that McCoy was coherent when he made his statements.

McCoy at first denied the shooting, then made his first admission when confronted with the lineup identifications and Camacho's statements. McCoy's signed, written confession, containing details of the murder, followed.

If the record indicates that the defendant acted with any purpose or rationality, the defense of voluntary intoxication is not available. *People v. Martin*, 233 Ill. App. 3d 466, 468, 599 N.E.2d 205 (1992). This is such a case. Our review of the record persuades us there is no reasonable likelihood that the defendant's testimony established the defense of voluntary intoxication. See *People v. Foster*, 168 Ill. 2d 465, 484-85, 660 N.E.2d 951 (1995); *People v. Crosby*, 243 Ill. App. 3d 1083, 1085, 614 N.E.2d 199 (1993).

Under the circumstances, we find that the trial court did not abuse its discretion when it refused to instruct the jury on voluntary intoxication. *People v. Arnold*, 104 Ill. 2d 209, 470 N.E.2d 981 (1984).

Excessiveness of the Sentence

McCoy received an extended sentence of 80 years' imprisonment. The trial court held that an extended sentence was warranted

because the murder in this case was brutal, heinous, and indicative of wanton cruelty.

Defendant challenges his sentence for the first time on appeal. The propriety of the sentence was not raised in defendant's post-trial motion. For this reason, the State argues, the issue is waived.

Waiver limits the parties, but not the courts. We may consider whether the sentence reflects an abuse of discretion. *People v. McCleary*, 278 Ill. App. 3d 498, 663 N.E.2d 22 (1996).

McCoy contends that the facts of this case do not support a finding that his actions were brutal or heinous. He also states that the trial court failed to make rehabilitation an objective and, in light of his background and criminal history, the sentence was excessive.

At the time of the offense McCoy was 19 years old. He did not complete his high school education, having been expelled from two schools. McCoy never was employed. In his presentence investigation he reported that he supported himself by selling cocaine. He also reported a daily usage of cocaine and alcohol.

At the time of his conviction for murder, McCoy was on probation for a robbery conviction and on bond for a charge of possession with the intent to deliver. That case was pending at the time of his murder conviction.

The evidence at trial showed that McCoy murdered 16-year-old Fleming, whom he did not know and had never met before. As revenge for a fellow gang member's death, McCoy decided to execute a total stranger. He walked to a residential area, to a place were several young men sat on a car on a warm summer day listening to music. He shot at the group, striking one as the others scattered. Fleming, who was shot twice, once in the neck and once in the shoulder, fell to the ground. We do not know if Fleming was still alive when McCoy stepped closer and shot Fleming in the head.

At sentencing, McCoy did not take the opportunity to speak. He never expressed any remorse for his actions. His attorney continued to urge that McCoy's drug usage was responsible, in part, for his actions.

■ Under these facts, we cannot say that the trial court's finding that McCoy's actions were brutal, heinous, and indicative of wanton cruelty was an abuse of discretion. *People v. Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882 (1977). In addition, the trial court specifically stated that it considered all the mitigating and aggravating factors, including rehabilitation, and believed that the sentence imposed was necessary to protect society. It is not for this court to reweigh the various factors. *People v. Cox*, 82 Ill. 2d 268, 412 N.E.2d 541 (1980).

Concerning other issues raised by the defendant, we hold:

(1) The trial court did not err when it found probable cause for the defendant's arrest.

(2) The trial court did not err when it instructed the jury, *sua sponte*:

> "When a witness is with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence."

That instruction would have been better left ungiven, but we find it caused no harm to the defendant.

(3) The trial court did not err when it allowed Jacob Camacho to testify while wearing an army uniform. He was in the army at the time and it was his uniform. There is no indication the uniform was an attempt to garner the jury's sympathy.

(4) There was, as the trial court found, ample proof of *corpus delicti*.

(5) The prosecutor said nothing during final argument that was unsupported by the record or so egregious as to constitute reversible error.

CONCLUSION

McCoy's conviction for murder and his extended 80-year sentence are affirmed.

Affirmed.

CAMPBELL, P.J., and BRADEN, J., concur.