NOTICE

Decision filed 02/02/10, corrected
02/17/10. The text of this decision
may be changed or corrected prior to
the filing of a Petition for Rehearing or
the disposition of the same.

NO. 5-08-0273

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the
) Circuit Court of
    Plaintiff-Appellee, ) Pulaski County.
)
v. ) No. 04-CF-127
)
EMMETT LANE, JR., ) Honorable
) William J. Thurston,
    Defendant-Appellant. ) Judge, presiding.
_____

JUSTICE CHAPMAN delivered the opinion of the court:

The defendant, Emmett Lane, Jr., was convicted of murder and attempted murder following a shooting in the parking lot of a nightclub. Both victims were United States Army staff sergeants on leave from Fort Campbell, Kentucky, at the time of the shooting. Three State witnesses, including the surviving victim, testified at the defendant's trial wearing their military uniforms. The defendant filed a petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2006)), arguing that (1) the trial court erred in denying his motion *in limine* to prohibit the State's witnesses from testifying in uniform and (2) he received ineffective assistance of appellate counsel because counsel failed to raise this issue on direct appeal. He appeals an order denying his petition after a hearing. We affirm.

On October 17, 2004, the defendant was charged by information with first-degree murder, attempted first-degree murder, aggravated robbery, and burglary. The charges stemmed from an altercation that had taken place in the parking lot of Club 37, a Pulaski County nightclub, in the early morning hours. The altercation escalated, culminating in the shootings of Alfonza Beasley and Floyd Lewis by the defendant. Beasley was shot twice in

1

the head and died as a result of his injuries. Lewis was shot once in the chest and once in the neck but survived. The defendant maintained that he acted in self-defense.

On March 15, 2005, just prior to the trial, the defendant filed a motion *in limine* seeking to prohibit the State's witnesses from wearing military uniforms at the trial. He argued that the witnesses would give testimony about events that were unrelated to their military service and that the uniforms could significantly prejudice the defendant at a time when the country was at war in Iraq.

On March 21, the State filed a response to the motion *in limine*. The State argued that (1) the defendant's motion failed to offer any rationale to support its assertion that the uniforms would be prejudicial, (2) military dress uniforms are the equivalent of civilian business suits, (3) the few courts to address this issue have permitted members of the military to testify in uniform, and (4) the issue is analogous to the question of whether to permit police officers to testify in uniform, something Illinois courts have found to be permissible (see, *e.g.*, *People v. Beil*, 76 Ill. App. 3d 924, 930, 395 N.E.2d 400, 404-05 (1979)). Attached to the State's response was an affidavit signed by assistant Attorney General Daniel Kay, who is an Army reservist. He averred that military dress uniforms are considered to be the equivalent of a business suit. He further averred that when active-duty members of the military testify in a military court, they are expected to wear their dress uniforms as a sign of respect for the court. Kay did not say whether the same principles apply to active-duty members of the military testifying in civilian court.

At the defendant's March 2005 trial, witnesses gave differing accounts of how the events leading up to the shootings unfolded. Private Lester Easley testified that he knew both Sergeant Lewis and Sergeant Beasley because they all served in the same platoon. Beasley was Easley's supervisor, and he was friends with both men. The events at issue took place at a birthday party for Cenethia Mackins, who was a friend of Easley. Mackins invited

Easley to her party, and Easley invited Lewis to come with him. Lewis brought along Beasley.

Easley testified that he arrived at Cenethia Mackins' home at approximately 7:30 on the evening of October 16, 2004. Several guests were gathering there prior to the party, which was to be held at Club 37, a local nightclub, later that evening. Easley did not arrive with Lewis and Beasley because he had driven from Fort Campbell, Kentucky, to his father's home near Mounds, Illinois, the previous night. When Easley arrived at Mackins' home, several guests were already there, including Lewis and Beasley. Three other guests who would play a role in the events leading up to the shooting were also there when Easley arrived: Iesheka Maxwell, Derrick Tucker, and Rashawn Davis. Tucker is the defendant's cousin. The defendant was not at Mackins' house before the party. Easley testified that all of these guests were drinking alcohol when he arrived.

Easley further testified that Rashawn Davis asked Lewis, an avid gun collector, whether he had any weapons with him. Lewis went to his truck with Davis, Easley, and Tucker to show them the two guns he had brought with him–a pistol and a rifle. Tucker then showed the men a 9-millimeter handgun he was carrying. According to Easley, Lewis then brought the rifle into the house so he could show it to other guests. However, Iesheka Maxwell saw the rifle and told Lewis not to bring it into the house; Lewis therefore locked both guns in his truck.

At some point, the guests left Mackins' house and drove in a convoy to Club 37, where they met up with other partygoers. After a few hours there, Beasley and Lewis told Easley they were leaving. The two left together after saying goodbye to Easley. A few minutes later, however, Lewis came back into the club and informed Easley that someone had broken into his truck and stolen his pistol. Easley went outside with Lewis to look at the truck. Lewis asked if Easley knew where Rashawn Davis was. Davis was the guest who had asked

3

to see his guns. Easley told Lewis that he would look for Davis, and he returned to the club to try to find him, leaving Lewis outside with Beasley. Easley found Davis quickly and asked if Davis knew anything about the break-in. Davis said that he had "heard about it" but that he did not know anything more about what had happened. Easley stated that he then went back out to the parking lot.

At this point, according to Easley, approximately 25 to 35 people were in the Club 37 parking lot. He testified on direct examination that Beasley and Lewis were "just talking among the crowd" and asking if anyone knew who had broken into the truck. On cross-examination, however, he admitted that Beasley and Lewis were actually yelling and cursing at the crowd. He further admitted that Beasley shouted, "You all some bitch ass niggers for breaking in my boy's truck without us looking." Easley attempted unsuccessfully to calm Beasley and Lewis.

The defendant and Tucker approached the group together. Lewis asked them if they knew anything about who had broken into his truck, and a heated exchange ensued. Lewis, Beasley, Tucker, and the defendant were all agitated but did not engage in any physical violence at this point. Easley stepped between Lewis and the defendant and pushed them apart.

According to Easley, Tucker then pulled out his 9-millimeter pistol and pointed it at Beasley. Beasley stepped back and pulled out Lewis's M4 rifle. Both Easley and Lewis testified that prior to this time, they had not realized that Beasley had taken the rifle from the truck. Their testimony relating to how Beasley was able to hide the rifle on his person was not entirely clear. Easley described the gun as being "wrapped in one of the shirts [that Beasley] was wearing." He testified that Beasley unwrapped the rifle, charged a round to the chamber, and pointed the rifle at Tucker. Beasley then pointed the gun down toward the ground and used his other hand to attempt to push Tucker's gun away. The defendant came

4

up from behind Beasley and attempted to "snatch" the rifle from his hand. There was a brief struggle while Beasley attempted to hold onto the weapon, but the defendant managed to take it.

Easley testified that the defendant shot Beasley in the head. After Beasley fell to the ground, the defendant stood over him and fired a second shot. He then turned toward Lewis and fired a shot at him. Lewis fell, the defendant shot him a second time as he lay on the ground, and then the defendant ran away.

Floyd Lewis also testified for the State. His testimony was mostly consistent with Easley's. Lewis testified that he and Beasley drove from Fort Campbell to Illinois for Cenethia Mackins' party, arriving at her home at 6:30 in the evening. Several guests were already present, although the party had not yet started. Easley was not at the house when they arrived; he arrived later. The defendant was not there either; they first encountered him at Club 37. Lewis testified that he and Beasley had brought several different types of liquor as a birthday present for Mackins. With the exception of Easley, who does not drink alcohol, all the guests who gathered at the house before the party were drinking the liquor they brought.

At approximately 7:30 p.m., Rashawn Davis asked Lewis whether he had any weapons with him. Lewis explained at the trial that he collects guns. He had brought two of his guns with him–an M4 rifle and a Springfield 1911 semiautomatic pistol. He testified that he had brought the guns mainly to show them off, although Easley's father had also invited him to use them for target-shooting on his rural property. The guns were locked in the back of his truck. When Davis asked to see them, Lewis went to the truck with Davis, Easley, and Derrick Tucker. After Lewis showed Davis and Tucker the two weapons, Tucker showed the men a 9-millimeter handgun he was carrying. Lewis then locked his guns in the truck and the men returned to the party.

Later, the group moved from Cenethia Mackins' house to Club 37, arriving there sometime between 9:30 and 10 p.m. Iesheka Maxwell drove Beasley and Lewis to Club 37 in Lewis's truck. Both Beasley and Lewis were drinking, and Maxwell agreed to act as their designated driver. The partygoers, who had begun drinking at Mackins' home, continued drinking at the club. Lewis estimated that he and Beasley each had three or four drinks while they were there. At 12:30 a.m., Maxwell, Beasley, and Lewis left the club. Lewis noticed that one of the back windows of the truck had been broken. When he looked in the back of the truck, he saw that his pistol was missing. The rifle, however, was still there. Lewis suspected that either Rashawn Davis or Derrick Tucker had taken the pistol because they were the only people who knew it was there, aside from Easley and Beasley. Maxwell and Beasley waited by the truck while Lewis went back into the club to find Easley and tell him about the theft.

Upon learning of the theft from Lewis, Easley walked back to the truck with Lewis. He then returned to the club alone to search for Tucker and Davis. Lewis testified that both he and Beasley were angry that someone had broken into Lewis's truck after they had bought drinks for the other guests at the club. He admitted that they both "started cursing everybody out, carrying on, letting them know it was messed up." Lewis explained that the defendant then approached the men and "said something to the effect that [']I don't care about your truck,['] or something like that." Easley stepped between the defendant and Lewis and pushed them apart. Easley tried to calm Lewis down, but Lewis admitted that he remained very agitated.

Lewis testified next that Tucker pulled out his 9-millimeter pistol and pointed it at Beasley's head. Lewis then noticed that Beasley had taken the M4 rifle from the truck. Beasley chambered a round. Lewis explained that the gun could not be fired unless this was done. Unlike Easley, Lewis testified that Beasley never pointed the gun at Tucker. Instead,

6

Lewis testified that Beasley pointed it down and tried to push Tucker's pistol out of his hand. Then the defendant came up behind Beasley, took the loaded rifle from his hands, and fired two shots into Beasley's head. Lewis testified that after he had seen the defendant fire the first shot, he started waving his hands and yelling "whoa, whoa, whoa," in order to draw the defendant's attention away from Beasley so he would not shoot Beasley a second time. The defendant, however, did shoot Beasley a second time, and then he shot Lewis. The first bullet hit Lewis in the chest. After Lewis fell, the defendant shot him a second time, this time in the neck.

The third State witness to testify in military uniform was Captain Rizwahn Shah. He was the platoon leader in command of Easley, Beasley, and Lewis. He was not present when the shootings occurred. He was called as a character witness to help rebut the defendant's claim that Beasley and Lewis were the aggressors.

Two witnesses testified for the defense–Iesheka Maxwell and Joshua Booth, a friend of the defendant who was also at Club 37 for the party. Maxwell testified that she left the club with Beasley and Lewis at 12:30 in the morning. As the trio approached Lewis's truck, they saw that a window in the back of the truck had been broken. Maxwell stated that Lewis immediately went back into the club and that she followed him. She saw Lewis approach Easley to tell him what had happened. Meanwhile, Maxwell found Cenethia Mackins and her sister and told them about it. Both Maxwell and Easley then followed Lewis back to the truck. According to Maxwell, Lewis took a black gun out of the truck, loaded the gun, and began walking toward Derrick Tucker. Easley and another partygoer, Greg Johnson, attempted to intervene. Johnson told Lewis to put the gun away, and Easley took the gun from Lewis. Maxwell heard the gun click and ran to hide behind a car. She testified that she heard gunshots seconds later but did not actually see the shooting.

Joshua Booth testified that he went to Club 37 for Cenethia Mackins' birthday party.

7

When he left the club to go home, he saw his brother standing in the parking lot staring at a man holding a black gun. Booth's brother ran toward the back of the building, and Booth heard a woman yell, "That's one of them niggers right there." According to Booth, when he turned around to see who it was, Beasley pointed the gun in his face. Booth stated that Beasley struck him in the elbow with the butt of the gun and said, "I should kill you." Just then, Derrick Tucker approached, and Beasley pointed the gun at Tucker. When Beasley looked away from Tucker for a moment, Tucker pulled out his own gun and pointed it at Beasley's head. Booth did not see the shooting because Beasley and Tucker then walked behind a truck, which blocked Booth's view. Booth testified that he heard someone tell the defendant, "They trying [*sic*] to kill your cousin." He then saw the defendant run behind the same truck. Seconds later, he heard a gunshot. After the shot, he saw a man fall backwards, although he did not know until later that the man who fell was Beasley.

The defendant did not testify. However, a recorded statement he made to police shortly after the shootings was introduced into evidence by the State and played for the jury. In it, he admitted to being intoxicated when the events at issue occurred. He stated that he left Club 37 at 12:30 a.m. and that as soon as he walked out the door, a man he did not know pointed a black assault rifle in his face and threatened to kill him. According to the defendant, the gun went off when he pushed it away from his face, and the man fell to the ground. He stated that he did not shoot the man a second time. Another man, whom the defendant assumed was a friend of the first man, stepped forward and tried to take the gun. The defendant struggled with the second man for the possession of the gun. During the struggle, the gun discharged, hitting the second man. The defendant admitted that he just walked away after the man had been shot.

The investigating officer told the defendant that he must have left some things out of his story because his account was inconsistent with the location of the wounds that the first

8

man sustained. The defendant changed his story. He stated that he and the first man struggled for the possession of the gun and that the gun accidentally discharged during their struggle. The defendant gained the possession of the gun, but, he explained, he thought the man was going for another gun, so he fired a second shot in self-defense. He denied that he shot the man while he was lying on the ground.

The jury returned verdicts of guilty. The defendant filed a posttrial motion, again raising the issue of the witnesses' military uniforms. The court denied the posttrial motion and sentenced the defendant to 51 years in prison. A judgment of conviction was entered in June 2005.

The defendant appealed his conviction, challenging only the prosecutor's closing arguments. *People v. Lane*, No. 5-05-0346, order at 7 (July 6, 2006) (unpublished order pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23)). He argued, in relevant part, that the prosecutor exceeded the bounds of proper argument by (1) repeatedly emphasizing that Easley and Lewis were in the military, thereby unfairly bolstering their credibility, and (2) arguing that the defendant had " 'murdered and executed an unarmed soldier.' " *Lane*, No. 5-05-0346, order at 8. We found that, although the comments were improper, they were not a material factor in the defendant's conviction. *Lane*, No. 5-05-0346, order at 10-11. We thus concluded that he suffered no prejudice as a result of these arguments. *Lane*, No. 5-05-0346, order at 11. We affirmed his conviction on July 6, 2006.

On May 21, 2007, the defendant filed a *pro se* postconviction petition. In an introductory section, he raised the following issues: (1) he was denied a fair trial because jurors were not questioned during *voir dire* about any bias they might have in favor of people serving in the military, (2) trial counsel was ineffective for failing to submit appropriate *voir dire* questions, and (3) appellate counsel was ineffective for failing to raise this issue on appeal. Although the defendant did not raise the issue of military uniforms as a separate

9

issue in this introduction, he did argue throughout his more detailed argument section that he had been prejudiced by counsel's failure to explore the issue of any promilitary bias that potential jurors might have because the witnesses testified in uniform. We note that he raised additional issues which are not relevant to this appeal. Counsel was appointed to represent the defendant, but he never filed an amended petition.

On March 27, 2008, the court held an evidentiary hearing on the defendant's petition. As previously noted, the defendant's petition raised additional issues that are not before this court. Much of the testimony adduced at the hearing related to one of those issues, defense counsel's failure to interview a potential witness who the defendant alleged might have provided exculpatory testimony. John Gleason, the attorney who represented the defendant in his direct appeal, testified; however, he could not remember many details about the defendant's case. He had read the briefs and this court's decision prior to testifying, but he stated that he could not independently recall anything else about the case. When the defendant's postconviction counsel began to ask Gleason about the issue of military uniforms, the State objected, arguing that the issue had been waived because it was not set out as a distinct issue in the *pro se* petition, which was the only petition on file. The court rejected that argument, finding that it was adequately addressed in the arguments in the defendant's petition. In this appeal, the State once again argues that the defendant waived the consideration of this issue by failing to raise it in his petition. Like the postconviction court, we find that the arguments in the body of the petition adequately address the issue.

Gleason testified that he could not remember why he did not raise the issue of the military uniforms, but he stated that "in all likelihood" he had researched the issue and found it to be without merit. He could not recall having done so, but he believed that it was the type of issue he would ordinarily consider. Gleason further testified that Derrick Tucker was tried in a separate trial before a different judge. The judge in Tucker's trial granted a motion *in*

10

*limine* and entered an order prohibiting the State's witnesses from testifying in uniform. After argument, the court took the matter under advisement. The judge told the parties that he would carefully review the transcript of the *voir dire* before ruling.

On May 6, 2008, the court entered a detailed written order denying the defendant's petition. The court first considered the defendant's claim that he did not receive a fair trial due to the lack of *voir dire* questions related to any bias that potential jurors might feel in favor of the State's military witnesses. The court found this contention–along with the related claims of ineffective assistance of trial and appellate counsel–to be without merit. The court explained that the argument was not supported by the record. All the jurors were at least asked in groups whether they had any bias either in favor of people serving in the military or against them. Defense counsel even asked a few of the potential jurors about the impact that seeing witnesses in military dress blues might have on them. The court also rejected the defendant's argument that appellate counsel was ineffective for failing to raise the issue of military uniforms on direct appeal. The court reasoned that the defendant's conclusion that the uniforms enhanced the witnesses' credibility was based on speculation, not evidence. The court therefore denied the defendant's petition. This appeal followed.

The Post-Conviction Hearing Act provides a three-step process that allows an incarcerated defendant to challenge his conviction on the grounds that it resulted from a substantial denial of a right protected by either the state constitution or the federal constitution. *People v. Johnson*, 377 Ill. App. 3d 854, 857-58, 879 N.E.2d 977, 980 (2007). At the first stage of this process, the court must determine whether the petition is frivolous or patently without merit. *People v. Hernandez*, 283 Ill. App. 3d 312, 316, 669 N.E.2d 1326, 1329 (1996) (citing 725 ILCS 5/122-2.1(a)(2) (West 1992)). If the court determines that it is, the court must enter a written order dismissing the petition within 90 days. 725 ILCS 5/122-2.1(a)(2) (West 2006). If the court does not dismiss the petition at the first stage, the

11

petition must be docketed for further proceedings. *People v. Pendleton*, 223 Ill. 2d 458, 472, 861 N.E.2d 999, 1007 (2006) (citing 725 ILCS 5/122-2.1(b) (West 2000)). At the second stage of the proceedings, the court may appoint counsel to represent an indigent defendant. Counsel may file an amended postconviction petition, and the State may file either a motion to dismiss the amended petition or an answer. If the petition is not dismissed at the first or second stage, the proceedings move to the third and final stage–an evidentiary hearing. *Hernandez*, 283 Ill. App. 3d at 316, 669 N.E.2d at 1329.

At both the second stage and the third stage, the defendant bears the burden of making a substantial showing that his conviction resulted from a violation of a constitutional right. *Pendleton*, 223 Ill. 2d at 473, 861 N.E.2d at 1008. On appeal from a third-stage denial of a postconviction petition, our standard of review depends upon whether the postconviction court was required to make any credibility determinations or findings of fact in reaching its decision. If it was required to make those findings, we will reverse its decision only if it was manifestly erroneous. If, however, no such findings were necessary, our review is *de novo*. *Pendleton*, 223 Ill. 2d at 473, 861 N.E.2d at 1008. Here, the court made findings of fact related to other issues raised in the petition but treated the issue of the witnesses' uniforms as a pure question of law. We note that the court did make one factual finding that is relevant to the question before us: it found that some of the potential jurors were specifically asked during *voir dire* how they might react to a witness testifying in a military uniform. However, most jurors were not asked this question, and our conclusion is not dependent on this finding. Our review will therefore be *de novo*.

The defendant contends that he received ineffective assistance of counsel in his direct appeal to this court. Claims of ineffective assistance of appellate counsel are governed by the same rules that govern claims of ineffective assistance of trial counsel. In order to prevail, a defendant must show that appellate counsel's failure to raise a particular issue on

12

direct appeal was objectively unreasonable. He must also show that he was prejudiced by counsel's failure to raise the issue. In order to show that he was prejudiced, the defendant must show that the underlying issue had merit. *People v. Childress*, 191 Ill. 2d 168, 175, 730 N.E.2d 32, 36 (2000).

In this appeal, the defendant argues that he was prejudiced at his trial by the combination of the prosecutor's closing arguments and the appearance of three State witnesses in military uniform. He argues that appellate counsel likely would have been successful had he raised the issue of the uniforms along with the arguments he raised with respect to closing arguments. Because of the interrelationship of these issues, a brief review of the rationale underlying our decision in the defendant's direct appeal will be useful.

In affirming the defendant's conviction, this court noted that the prosecutor's repeated references to Easley, Lewis, and Beasley as "soldiers" or "sergeants" were not inherently improper. We explained that, ordinarily, it is permissible to address witnesses or refer to individuals by their professional titles. *Lane*, No. 5-05-0346, order at 9. Thus, we found no merit to the defendant's contention that the repeated references were an attempt by the State to improperly bolster the credibility of Easley and Lewis. *Lane*, No. 5-05-0346, order at 9. We acknowledged, however, that "referring to a person as 'soldier' may elicit a patriotic passion in ordinary citizens." *Lane*, No. 5-05-0346, order at 9-10. We also emphasized that challenged comments must be viewed in the context of the prosecutor's closing argument as a whole. *Lane*, No. 5-05-0346, order at 8 (citing *People v. Kitchen*, 159 Ill. 2d 1, 38, 636 N.E.2d 433, 450 (1994)). We thus considered the combined effect of these repeated references and the prosecutor's statement that the defendant " 'murdered and executed an unarmed soldier.' " *Lane*, No. 5-05-0346, order at 10.

Considering the statements cumulatively, we found them to be improper. We explained:

13

"This case did not involve a battle on hallowed ground; it involved a street fight with tragic consequences. It is clear that the imagery created by the comments, such as 'the execution of an unarmed soldier,' serves no purpose other than to arouse the passions and prejudices of jurors, and we strongly recommend that prosecutors refrain from these types of remarks in future trials." *Lane*, No. 5-05-0346, order at 10.

Although finding the remarks improper, we held that a reversal was not warranted because the remarks were not a material factor in the defendant's conviction. *Lane*, No. 5-05-0346, order at 10-11. In reaching this conclusion, we noted that the particularly inflammatory remark about the defendant " 'execut[ing] an unarmed soldier' " came at the beginning of the prosecutor's closing argument and was not repeated, the jury was instructed that closing arguments were not evidence, and the record contained "substantial evidence" of the defendant's guilt. *Lane*, No. 5-05-0346, order at 10. As previously mentioned, the defendant now argues that this conclusion would have been different had appellate counsel raised the additional issue of the State's witnesses being allowed to testify in military uniforms. For the reasons that follow, we disagree.

We note that neither party has cited any case where the court considered the potential prejudicial effect of military uniforms in any detail, and we are aware of none. The only Illinois case to address this issue even summarily is *People v. McCoy*, 281 Ill. App. 3d 576, 666 N.E.2d 805 (1996). That case involved a gang-related murder. One of the State's principal witnesses was a former gang member who subsequently joined the military. *McCoy*, 281 Ill. App. 3d at 578, 666 N.E.2d at 807. Because he was an active-duty member of the Army at the time of the trial, he wore his uniform when he testified against the defendant. On appeal, the defendant raised eight issues. The court focused its discussion on just three of those issues and then rejected the five additional claims without discussion–including the defendant's contention that the court erred by allowing the witness

to testify in uniform. *McCoy*, 281 Ill. App. 3d at 586, 666 N.E.2d at 812. The appellate court stated, without explanation, as follows: "The trial court did not err when it allowed Jacob Camacho to testify while wearing an army uniform. He was in the army at the time and it was his uniform. There is no indication that the uniform was an attempt to garner the jury's sympathy." *McCoy*, 281 Ill. App. 3d at 586, 666 N.E.2d at 812. Because the court's treatment of the issue was so cursory, we find little guidance from its decision.

Although not precisely analogous, we find the case of *People v. Beil* instructive. That case involved a defendant's claim that allowing a police officer to testify against him in uniform caused the jury to accord more credibility to the officer's testimony. The appellate court found the claim to be without merit for two reasons. First, the court explained, the officer was testifying in his official capacity about events he observed in his official capacity. *Beil*, 76 Ill. App. 3d at 930, 395 N.E.2d at 404. More relevant for our purposes, the court simply gave no credence to the defendant's claim that jurors were likely to accord the police officer more credibility because they saw him testify in uniform. The court pointed out that the State could not be precluded from revealing to jurors the fact that its witness was a police officer even if he were precluded from testifying in uniform. The court also pointed out that the process of *voir dire* could allow defense counsel to determine whether prospective jurors were likely to have a bias in favor of the officer merely because he was a police officer. *Beil*, 76 Ill. App. 3d at 930, 395 N.E.2d at 404.

Only the second portion of the *Beil* court's holding is pertinent here. Unlike the police officer in *Beil*, Easley and Lewis testified here about events that occurred while they were on leave and which had nothing to do with their military service. However, just as the jurors in *Beil* necessarily knew that the State's witness was a police officer, it would have been difficult to keep the jurors in the defendant's trial from knowing that the three witnesses were in the military. The record reveals that the State was concerned with the possibility that

15

jurors might be prejudiced against Lewis and Beasley and in favor of the defendant because he was a local resident, while they were visitors who essentially came to Pulaski County to attend a party at a bar for a woman they barely knew. Indeed, a number of potential jurors were dismissed for cause due to their close connections to the defendant. It was therefore relevant for the State to show that Lewis and Beasley served in the same platoon as Mackins' friend, Easley. Their military status was also relevant to the defense, as defense counsel attempted to impeach Easley's credibility by showing that he was Lewis's subordinate and thus had a motive to testify falsely to protect Lewis. Therefore, whatever prejudices jurors might have had in favor of people serving in the military would have been a factor even if the witnesses had testified in civilian clothing. Furthermore, the defense not only could but did question potential jurors about any biases they might have in favor of people serving in the military.

The State points us to a handful of cases from other jurisdictions that have considered the issue before us. None have considered it in any depth, but all have held that it is not error to allow witnesses who are in the military to testify wearing their military uniforms. We find support for our conclusion in the reasoning of these cases.

In *Galmore v. State*, the Indiana Supreme Court considered whether the trial court erred in allowing the victim of a battery to testify at the trial wearing his military uniform. *Galmore v. State*, 467 N.E.2d 1173, 1175 (Ind. 1984). Much like the defendant in this case, the defendant in *Galmore* argued that this served both to bias the jurors in favor of the victim and to enhance his credibility as a witness. *Galmore*, 467 N.E.2d at 1176. In rejecting this contention, the court noted that in previous cases, it had found that allowing police officers to testify in uniform would not unfairly enhance their credibility. *Galmore*, 467 N.E.2d at 1176 (citing *Brown v. State*, 256 Ind. 444, 446, 269 N.E.2d 377, 378 (1971)). As previously mentioned, Illinois courts have reached the same conclusion.

16

Moreover, the *Galmore* court observed that the defendant "presented only his own conclusions as to the effect of the victim's appearance at trial in his military uniform." *Galmore*, 467 N.E.2d at 1176. We reach the same conclusion here. At the hearing on his postconviction petition, the defendant attempted to support his argument by reference to a poll which showed that a high percentage of Americans hold those serving in the military in high esteem. The court sustained the State's objection on the grounds that the poll was not entered into evidence. Perhaps more significantly, however, we do not believe that holding the military in high esteem necessarily means according military witnesses a greater degree of credibility than nonmilitary witnesses. The impact of the uniforms themselves on jurors' perceptions of witnesses they already know to be in the military is even more speculative.

In *People v. Lloyd*, a New York appellate court was similarly brief in addressing a defendant's claim that he was denied a fair trial when a robbery victim was allowed to testify wearing his Navy uniform. *People v. Lloyd*, 141 A.D.2d 671, 672, 529 N.Y.S.2d 562, 562 (1988). The court agreed with the trial court's conclusion that jurors "would not automatically accord the complainant a greater measure of respect and trust merely because he was wearing a Navy uniform." *Lloyd*, 141 A.D.2d at 672, 529 N.Y.S.2d at 562. The court went on to state as follows:

"This is especially true in the instant case where the complainant was a third-class petty officer who admitted to socializing in the streets with friends who drank beer and smoked marihuana. Moreover, the trial court instructed the jury in its charge that the complainant's testimony should not be accorded greater or lesser weight simply because he testified in uniform ***." *Lloyd*, 141 A.D.2d at 672, 529 N.Y.S.2d at 562.

This case, too, involves circumstances in which the credibility of the witnesses is unlikely to be unfairly bolstered by their appearance in military uniform. As previously discussed, there was some legitimate concern about jurors being biased against at least one of the

witnesses, Lewis, because the defendant was a local resident and he was not. In addition, there was uncontroverted testimony that Beasley and Lewis were behaving belligerently in the parking lot of a nightclub where they had consumed a lot of alcohol.

The Connecticut Supreme Court reached the same decision with even less discussion in *State v. Lemieux*, 160 Conn. 519, 522, 280 A.2d 874, 875 (1971), stating only that the robbery victim was serving in the Army when he testified against the defendant and finding no error in the court's decision to allow him to wear the uniform. In *People v. Mitchell*, 143 A.D.2d 421, 422, 532 N.Y.S.2d 428, 428 (1988), the New York court followed its previous decision in *Lloyd* without comment.

The defendant argues that these cases are distinguishable for several reasons. First and foremost, he points out that all of them were decided prior to the attacks of September 11 and the current war in Iraq, events which, he contends, have led to a greater sense of patriotism and support for the military than existed previously. For the reasons we have already discussed, we do not believe that support for members of the military automatically accords them a higher degree of credibility as witnesses.

The defendant also argues that the instant case is distinguishable from all the above cases because it involved three witnesses in military uniform, whereas the other cases involved only one. We agree that any potential prejudice is increased if there are three witnesses rather than just one, but there has to be prejudice to begin with, and we simply do not find that to be the case. Similarly, the defendant contends that this case is distinguishable from *McCoy* because the witness in *McCoy* was just a witness, not a victim, and it is distinguishable from the out-of-state cases because none of those cases involved a murder. We believe these to be distinctions without differences.

Next, the defendant argues that this case is different from *McCoy* because the State here attempted to bolster the credibility of its witnesses by seeking to introduce evidence that

18

its witnesses had served in Iraq. In making this argument, the defendant relies on the following statement from *McCoy*: "There is no indication the uniform was an attempt to garner the jury's sympathy." *McCoy*, 281 Ill. App. 3d at 586, 666 N.E.2d at 812. Here, the State admitted that it was seeking to admit evidence of its witnesses' recent deployments to Iraq to enhance their credibility. The prosecution argued that it was necessary to do so because questions might arise in the minds of jurors about whether they were avoiding combat duty, if the jury was not made aware of the witnesses' recent deployments. The prosecution further argued that witness credibility was always an issue and that showing that its witnesses had served in Iraq would show jurors that they had a code of behavior that they followed. The trial court rejected these somewhat disingenuous arguments, however. The defendant cannot claim that he was prejudiced by the State's unsuccessful attempt to introduce improper evidence for an improper purpose. A jury cannot possibly be swayed by evidence that is not before it.

Finally, we reiterate what we stated in the defendant's direct appeal: the record contains *substantial* evidence of the defendant's guilt. We acknowledge that the testimony against him was not uncontroverted, there were minor inconsistencies between the testimony of the State's two key eyewitnesses, and there is little question that the two victims were acting belligerently and that at least one of them was armed at one point. However, the forensic evidence showed that Alfonza Beasley was shot a second time while he was lying helplessly on the ground, and the jury saw a recorded statement by the defendant in which he gave implausible and contradictory accounts of the shootings which were refuted by the forensic evidence. In the face of this overwhelming evidence of his guilt, we conclude that appellate counsel could not have obtained a different result had he raised the issue of the witnesses' uniforms on direct appeal along with the issues that actually were raised.

Accordingly, we affirm the judgment of the circuit court denying the defendant's

postconviction petition.

Affirmed.

SPOMER and STEWART, JJ., concur.

NO. 5-08-0273

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Pulaski County. |
| | ) | |
| v. | ) | No. 04-CF-127 |
| | ) | |
| EMMETT LANE, JR., | ) | Honorable |
| | ) | William J. Thurston, |
| Defendant-Appellant. | ) | Judge, presiding. |

**Opinion Filed**:    February 2, 2010

**Justices**:    Honorable Melissa A. Chapman, J.,

Honorable Stephen L. Spomer, J.,
Honorable Bruce D. Stewart, J.,
Concur

**Attorneys for Appellant**    Michael J. Pelletier, State Appellate Defender; Gary R. Peterson, Deputy Defender; Jacqueline L. Bullard, Assistant Appellate Defender; Office of the State Appellate Defender, Fourth Judicial District, 400 West Monroe Street, Suite 303, P.O. Box 5240, Springfield, IL 62705-5240

**Attorneys for Appellee**    Hon. Donna McCann, State's Attorney, Pulaski County Courthouse, Mound City, IL 62963; Patrick Delfino, Director; Stephen E. Norris, Deputy Director; Patrick D. Daly, Staff Attorney; Office of the State's Attorneys Appellate Prosecutor, 730 E. Illinois Hwy. 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864