NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 190882-U

NO. 4-19-0882

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 10, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Coles County |
| TONY HAWKINS, | ) | No. 18CF700 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | James R. Glenn, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice DeArmond and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Because the trial court committed error by permitting the minor child to testify via closed-circuit television, the trial court's judgment must be reversed, and the cause remanded for further proceedings on count I. Because the charge comprising count II was subject to compulsory joinder with previously filed and dismissed charges, the conviction on count II must be vacated.

¶ 2    On September 20, 2019, a jury convicted defendant, Tony Hawkins, of two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)). Prior to trial, defendant had filed a motion to dismiss both counts, arguing the State was barred from prosecuting him, pursuant to double jeopardy principles and the statute requiring compulsory joinder *id.* § 3-3(b)). The trial court denied the motion, and the matter proceeded to trial. Upon conviction, the court sentenced defendant to 32 years in prison on count I, to be served consecutively to 25 years' imprisonment on count II.

¶ 3        In this direct appeal, defendant raises three issues. First, he asserts the charge comprising count II was subject to compulsory joinder and was barred by double jeopardy. Second, he argues the trial court committed error by admitting statements of the victim and others describing uncharged conduct and other bad acts. Third, he asserts the court should not have permitted the victim to testify via closed-circuit television (CCTV).

¶ 4        We reverse the judgment of the trial court, and remand for further proceedings on count I. We vacate defendant's conviction on count II.

¶ 5                                I. BACKGROUND

¶ 6        Defendant and Debra Trowbridge had been married for 19 years, and had two children, D.H., a boy, born in 2008, and J.J. (most commonly used in the record, but sometimes referred to by her actual initials, J.H.), a girl, born in 2012. At some point during the marriage, defendant began living separately from the rest of the family. However, Debra and the children spent the weekends at defendant's home until June or July 2015, when defendant began having visitation with the children. In November 2015, an order was entered in a dissolution of marriage proceeding between defendant and Debra, finding grounds for the dissolution but reserving the remaining issues.

¶ 7                            A. Prefiling Investigation

¶ 8        In July 2016, Debra sought, and was granted, an emergency order of protection (OP) against defendant. On July 22, 2016, Pam Riddle, with the Child Advocacy Center of East Central Illinois (CAC), interviewed J.J. and D.H. Both prior to and after the interview of J.J., Riddle met with an investigator from the Illinois Department of Children and Family Services (DCFS) and Coles County Sheriff's Department Detective Christina Stephens. The genesis for the CAC interview was statements J.J. had made about defendant, which had been reported to either

DCFS or law enforcement. During the interview, Detective Stephens communicated with Riddle. Relevant to this appeal, among other things, J.J. indicated during the interview that defendant put his "finger(s)" into her mouth and they "grew," terms which reappear in reports related to J.J.'s statements.

¶ 9        On July 28, 2016, J.J. was physically examined and interviewed by Noelle Cope, a nurse in the pediatric department at Sarah Bush Lincoln Hospital. Debra and someone from the CAC were also present for the interview. Cope noted the statements J.J. made required further investigation. The statements made by J.J. at this interview were reported to DCFS.

¶ 10        In August 2016, according to Cynthia Whitt, a close friend of Debra's who had been watching the children regularly, J.J. said defendant "had grabbed her hand and made her touch his bad spot and kiss it." Shortly after a court granted Debra the OP, J.J. described to Whitt occasions when (1) defendant covered her eyes; (2) defendant said he was putting his "fingers" in her mouth, which then grew; and (3) water, which tasted like "snot," came out of his "fingers." In September 2016, Whitt met with one of the law enforcement officers investigating defendant's relationship with J.J. and shared the foregoing statements, as well as others, with that officer.

¶ 11        On October 2, 2016, Detective Stephens interviewed Debra during the investigation of defendant. Stephens asked Debra about J.J.'s statements, including about (1) what part of the body grows and grows, (2) what part of the body water comes out of, and (3) defendant covering J.J.'s eyes and putting "fingers" in her mouth.

¶ 12        On October 6, 2016, DCFS issued an indicated finding of abuse relative to defendant and J.J. The report was based on J.J.'s statements, including that defendant put "his finger in [J.J.'s] mouth and that his finger grows and grows, which indicates that [defendant] puts

his penis in her mouth." On October 26, 2016, DCFS provided its report to the Coles County State's Attorney.

¶ 13       Also on October 26, 2016, J.J. began seeing Catherine Miller, a counselor. Among other statements, J.J. told Miller at the first visit defendant stuck "fingers" in her mouth and then into her throat, which choked her. Miller saw J.J. on multiple occasions, and on December 8, 2016, Miller made a verbal report about defendant's contact with J.J. to DCFS. Miller followed up on December 12, 2016, with DCFS by providing a written report. J.J. continued seeing Miller throughout the pretrial process in the previous prosecution, during which time J.J. reported: (1) several times defendant took her clothes off while they were in bed, (2) several times defendant got in the shower with her, and (3) several times defendant touched her "butt" with his finger or tried to put his finger in her "butt." During many other visits with Miller, J.J. did not talk about defendant.

¶ 14       On November 21, 2016, J.J. testified at the plenary OP hearing in the proceeding referenced above. She described, *inter alia*, on two different occasions during her testimony about defendant putting his "fingers" into her mouth, which then "grew."

¶ 15       B. The Proceedings and Charges in Coles County Case No. 16-CF-472

¶ 16       On December 22, 2016, the State filed three counts of predatory criminal sexual assault of a child in Coles County case No. 16-CF-472 against defendant, alleging generally defendant touched J.J.'s sex organ and anus with his fingers "in or about Spring or Summer of 2016."

¶ 17       In that prosecution, the State filed a motion pursuant to section 115-10 of the Code of Criminal Procedure (Code) (725 ILCS 5/115-10 (West 2016)) to admit statements J.J. made to

various individuals, including those described above. After hearing testimony and arguments, the trial court granted the motion, except as to the statements Whitt related.

¶ 18        The State also sought leave to permit J.J. to testify via CCTV, pursuant to section 106B-5 of the Code (*id.* § 106B-5), relative to which the trial court also heard testimony. Debra testified, in conclusory fashion, that J.J. (1) was afraid of the courtroom and defendant, (2) experienced bed-wetting and nightmares about defendant's attorney for a short period after testifying at the plenary OP hearing, and (3) would suffer severe emotional distress resulting in severe adverse effects and be unable to communicate if she had to testify in the courtroom with defendant present. She also described a picture J.J. drew of defendant with sharp and bloody teeth, and admitted defendant was not present in the courtroom for J.J.'s testimony at the plenary OP hearing. The record also reflects defendant's attorney at the plenary OP hearing is not the attorney who represented him in the instant matter. Based on Debra's testimony, the court concluded requiring J.J. to testify in open court with defendant present would result in severe emotional distress and make her unable to communicate or cause severe adverse effects, and it granted the State's motion.

¶ 19        In January 2018, the State advised the trial court it had reached a negotiated resolution with defendant. Defendant was to plead guilty to misdemeanor battery and avoid incarceration. The State assured the court the offer was based on an analysis of the strengths and weaknesses of its case, and the individual prosecutor's eight years' experience trying these types of cases. The State's primary goal of the plea agreement, the State explained, was to assure J.J. was protected by an OP, in effect in another proceeding, the continuation of which the parties represented was tied to the conviction of defendant. The court, after hearing from the parties, rejected the plea agreement.

¶ 20        In December 2018, the trial court empaneled and swore in a jury. The day after jury selection, December 12, 2018, the State advised the court J.J. had made a "new disclosure," with which it intended to charge defendant. Defendant argued compulsory joinder required the charges to be joined with the pending ones, but the State noted such joinder applied only to offenses known to the prosecuting officer at the time of the filing of the pending charges. The State asserted, "obviously that's not the case." The court took testimony about the purportedly new allegations, at which time Debra identified the new allegation was that defendant had J.J. "kiss" his penis.

¶ 21        The State, after a colloquy with the trial court, asked for some time to consider its options, which the court permitted. After the break, the State elected to dismiss the charges. Defendant, the State, and the court noted the dismissal would be with prejudice, given the empaneling of the jury. After confirming with defendant that he did not object to the dismissal, the court dismissed the charges.

¶ 22        C. The Filing of Charges and Motion to Dismiss

¶ 23        Later in the day of the State's dismissal, the State filed the instant charges, two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)). Count I alleged defendant caused contact between his sex organ and the mouth or tongue of J.H., "between about July 2015 and July 2016," by placing a substance on his sex organ and having "J.H. lick it." Count II made the same allegation, and simply added "at his house." Defendant filed a motion to dismiss the charges based on double jeopardy and compulsory joinder (See *id.* § 3-3(b)). Defendant argued the charges were not "new" to the State, as such statements were known from the beginning of its investigation. Defendant noted, *inter alia*, he had received no discovery beyond what he had received in the in the 2016 prosecution relative to the "new" charges.

¶ 24       The prosecutor who made the charging decisions in both matters, and the decision to dismiss the first charges, Thomas Bucher, proffered and testified he believed, at the time he filed the charges in December 2016, that he was aware of J.J.'s description of defendant putting fingers in her mouth, followed by the fingers growing and water coming from them. Bucher determined what charges to file in the first case based on the transcript of J.J.'s testimony at the plenary OP hearing, the video recording of her interview with Riddle, and a police report. Bucher "labored" for two years whether to file charges based on the "fingers in the mouth" allegations but did not file such charges.

¶ 25       After considering the evidence and the arguments of the parties, the trial court noted the nature of the allegations in the prior case. The court advised it had reviewed some of the transcripts of the testimony from the section 115-10 hearing on the admissibility of J.J.'s statements to others in the prior matter, as well as some of the testimony at the OP hearing. The court found the State was aware J.J. described, on several occasions, defendant putting his "fingers" in her mouth, which then grew, and water came out.

¶ 26       The trial court found the allegations made in December 2018, underlying the charges herein, related to "another alleged event," which the State did not learn of until December 2018. The court ruled the statements the State was aware of prior to December 2018 were not "descriptive enough," such that "the State could responsibly believe that it could convince a trier of fact beyond a reasonable doubt that the defendant placed his sex organ in the child's mouth." For that reason, the court believed the State did not charge such conduct previously, and the charges were not subject to compulsory joinder with those in the prior prosecution. Thus, the court denied the motion to dismiss.

¶ 27              D. State's Motion to Admit J.J.'s Hearsay Statements

¶ 28        The State filed a motion to admit statements of J.J. pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2016)). The State argued such statements were admissible to explain J.J.'s relationship to defendant and provide context. The State attached transcripts of testimony from the section 115-10 hearing in the prior criminal case, and from the hearing on the plenary OP in the civil matter. The trial court considered the statements described below and granted the State's motion, except as to Whitt's testimony.

¶ 29        In the prior prosecution, Miller testified (1) she was a counselor who met with J.J. over two dozen times, (2) J.J. told her defendant stuck his "fingers" into her throat and choked her by doing so, (3) J.J. told her defendant would rub his bad place on her while in bed together, (4) J.J. told her she and defendant showered together and defendant rubbed his finger on her butt, (5) J.J. told her defendant watched movies with her where people were naked and touched each other in their bad places, (6) J.J. told her defendant touched her like they saw in the movies, and (7) J.J. told her defendant removed a piece of candy from her mouth with his tongue.

¶ 30        Riddle, who had conducted the interview of J.J. at the CAC, testified about that interview as described above. Among other statements, Riddle testified (1) J.J. told her defendant put his finger(s) into her imaginary sister's mouth and they went all the way to her "tummy" and (2) defendant touched her butt. The trial court also watched a video of this interview, during which J.J. stated, in addition to the foregoing: (1) she showered by herself at her father's house and always wore pajamas; (2) defendant only touched her bad spot while in the bathroom; (3) defendant only touched her once in his bedroom when she did not have clothes on, except her underwear, and he did so with his hand; (4) she never touched defendant's bad spot; and (5) she did not sit on defendant's lap in his living room, nor did he touch her bad spot while sitting there.

¶ 31    The transcripts presented by the State from the previous section 115-10 hearing also contained the testimony of several other witnesses who testified about various other reports of abuse by J.J. about defendant, including (1) defendant putting his "fingers" in her mouth, (2) defendant showering with J.J., (3) defendant trying to put his finger in J.J.'s butt, (4) defendant touching J.J's "bad spot" while on the couch with her, and (5) playing Uno while they were partially or fully undressed.

¶ 32    The trial court also heard testimony from Mary Tewell, who did not testify in the previous prosecution. Tewell was an interviewer with the Champaign County CAC (Riddle was with the CAC of East Central Illinois), who conducted an interview with J.J. on January 18, 2019. During this interview J.J. reported (1) on one occasion defendant put his "fingers" in her mouth and something came out that tasted like "snot water"; (2) defendant touched her "bad spot" when she took a bath; (3) when defendant showered with J.J., he put his finger in the crack of her butt; (4) when she and her brother were playing at her aunt's house, defendant took her into the bathroom, where he put jelly on his "bad spot" and made her "kiss" it repeatedly; (5) on one occasion in the middle of the night, defendant made her hold his "bad spot" while they walked to the kitchen; and (6) defendant put his hand in her pants and rubbed her "bad spot." The court determined it would also admit Tewell's descriptions of her interview of J.J.

¶ 33        E. Defendant's Motion to Bar Prior-Bad-Act Evidence

¶ 34    Defendant also filed a motion seeking to bar the State from presenting evidence of certain prior bad acts, particularly relating to any uncharged conduct. Defendant noted the State failed to seek leave to present such evidence pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)). The trial court denied the motion, ruling the State had given appropriate notice in the section 115-10 proceeding.

¶ 35        F. The State's Motion to Permit J.J. to Testify Remotely

¶ 36     The State also filed a motion to permit J.J. to testify via CCTV. It made no argument and simply advised the trial court it would stand on its motion, Debra's earlier testimony on the issues in the 2016 prosecution, and the court's ruling in the prior matter. Defendant noted the court only had before it the mother's testimony and, referencing the existing jurisprudence on the issue, argued the State had not met its burden because it failed to present the testimony of any professional that J.J. would suffer serious emotional harm such that she could not testify. The court granted the State's motion, finding J.J. would suffer emotional distress preventing her from reasonably communicating and suffer adverse side effects if she was required to testify in open court.

¶ 37            G. Jury Trial

¶ 38     On September 17, 2019, the day of trial, the State filed an amended count II, replacing the allegation that defendant placed something on his sex organ and had J.J. lick it with an allegation that defendant had J.J. kiss his sex organ. Defendant objected, claiming such amendment was barred by double jeopardy, as the State knew about this allegation in the prior matter. The trial court disagreed, finding the act was different than what the State knew about, and it permitted the amendment.

¶ 39     The State called J.J. as its first witness, who testified via CCTV, describing both charged and uncharged conduct. She testified, *inter alia*, (1) defendant put his "fingers" in her mouth, (2) she was not sure if it actually was defendant's "fingers" in her mouth, (3) the "fingers" grew and "snot water" came out of them, (4) defendant touched her "bad spots" while she was bathing, (5) defendant tried to put his finger in her bottom several times, (6) defendant would rub her front "bad spot," and (7) defendant had her kiss his "bad spot."

¶ 40     The State then called Cope, the nurse who interviewed J.J., who described that interview.

¶ 41     D.H., J.J.'s brother, testified about his observations of defendant and J.J. D.H. testified he saw (1) defendant put his hand in J.J.'s underwear, (2) defendant put his finger in J.J.'s bottom, and (3) them walking naked while J.J. was holding defendant's "bad spot." He denied having father/son time with defendant but was shown photos of participating in many different activities with defendant.

¶ 42     Glenda Branson, J.J.'s daycare provider, testified about statements J.J. made suggesting she feared defendant.

¶ 43     Richard Kash, the guardian *ad litem* in the dissolution proceeding, testified J.J. was very verbal. She told him she wanted to see her "nice dad" but not her "mean dad." Kash also described D.H. as angrier than J.J.

¶ 44     Riddle testified about the CAC interview of J.J., and the recording of the interview was played for the jury.

¶ 45     Debra testified consistently with her prior statements, as did Miller, who had counselling sessions with J.J. Tewell, from the Champaign County CAC, related her interview as well, also described above. A recording of this interview was also played for the jury.

¶ 46     And finally, the State called Detective Stephens, who described her investigation.

¶ 47     After the trial court denied defendant's motion for a directed verdict, defendant called his niece, Ashley Updengraff. She described defendant's frequent visits with J.J. and D.H. to her house, where all three of them slept in the living room, and the various and appropriate activities defendant engaged in with J.J. and D.H.

¶ 48 Heidi Rawlings, defendant's sister, testified she had always regularly spent time with defendant, J.J., and D.H. After the dissolution, they usually stayed with Rawlings. Rawlings too described the appropriate sleeping arrangements in her living room, and the many activities defendant and the children engaged in when visiting. Also, contrary to the testimony of J.J. and D.H., Rawlings testified defendant never punched her or made her leave her own home so that defendant could be alone with J.J.

¶ 49 Defendant called several other witnesses, many from his church, who testified about his loving relationship with J.J. and D.H., their affection for him, and his reputation for morality and chastity. Defendant then testified about his relationship with his children and their activities. He denied the various allegations about inappropriate contact with J.J.

¶ 50          H. Closing Argument, Posttrial Motion, and Sentencing

¶ 51 During its closing argument, the State argued, *inter alia,* J.J. was unquestionably referring to defendant's penis when she spoke of defendant putting his "fingers" in her mouth, which grew, and snot water came out. The jury convicted defendant of both offenses.

¶ 52 Defendant filed a posttrial motion asserting, among other claims, (1) the charges were subject to compulsory joinder with the prior charges and were barred by double jeopardy, (2) it was error to admit J.J.'s statements describing uncharged offenses, (3) the trial court should not have permitted other bad act testimony, and (4) the court committed error by permitting J.J. to testify via CCTV. On December 9, 2019, the court denied defendant's request for relief, and sentenced defendant to consecutive prison terms of 32 years on count I and 25 years on count II.

¶ 53 This appeal followed.

¶ 54          II. ANALYSIS

¶ 55          A. Waiver of Compulsory Joinder/Double Jeopardy Argument

¶ 56 As an initial matter, the State argues defendant acquiesced in the dismissal of the original charges and the filing of new ones, and thus is estopped from raising compulsory joinder or double jeopardy arguments on appeal. However, a review of the report of the proceedings reveals defendant merely advised the trial court he had no objection to the dismissal of the original charges, when asked "for the record" by the court. Thus, defendant agreed for procedural purposes, without waiving any substantive arguments. Notably, in this colloquy, defendant raised the possibility compulsory joinder applied. At the time as well, the new charges had not been filed, so defendant certainly had not seen them. Therefore, we disagree with the State's waiver argument and will address defendant's joinder argument on the merits.

¶ 57 B. The Allegations of Count II Were Subject to Compulsory Joinder

¶ 58 Defendant argues the State knew, by the time it filed the first charges, of the allegations he caused contact between his sex organ and J.J.'s mouth. For that reason, defendant asserts the State was required to join the allegations contained in count II with the charges filed in the former prosecution, and its failure to do so requires us to vacate defendant's conviction on count II, pursuant to compulsory joinder and double jeopardy principles. For the following reasons, we agree the charge should have been joined with those filed in the first matter.

¶ 59 We review questions of statutory construction, including the language of the compulsory joinder statute, *de novo*. *People v. Hunter*, 2013 IL 114100, ¶ 12.

¶ 60 The compulsory joinder statute provides, in pertinent part, as follows:

"If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution, except as provided in Subsection (c)

- 13 -

[(where the court may order a separate trial in the interest of justice)], if they are based on the same act." 720 ILCS 5/3-3(b) (West 2018).

¶ 61                                    1. *The Same Act*

¶ 62        We must first interpret what the phrase "the same act" means for purposes of the compulsory joinder statute. *Hunter*, 2013 IL 114100, ¶ 12. In *Hunter*, the State initially charged defendant with possession of cannabis with intent to deliver, but not with any offenses related to the firearms found at the time of the arrest and search of defendant, which occurred immediately after officers observed defendant making a sale of cannabis. *Id.* ¶¶ 3-5. A few days short of six months after defendant's arrest and initial appearance on a single cannabis charge, the State indicted defendant for multiple firearm violations. *Id.* ¶ 6. The State argued the firearm and cannabis charges were separate acts for purposes of joinder and could not be characterized as the "same act" requiring simultaneous prosecution. *Id.* ¶ 15.

¶ 63        The supreme court noted it had previously explained the purpose underlying compulsory joinder is "to prevent the prosecution of multiple offenses in a piecemeal fashion and to forestall, in effect, abuse of the prosecutorial process." (Internal quotation marks omitted.) *Id.* ¶ 18. As to determining what constitutes "the same act," the supreme court rejected "a hypertechnical interpretation to create multiple acts based on discrete moments in time." (Internal quotation marks omitted.) *Id.* In doing so, the court considered a colloquy between the State and the trial court, at the hearing on defendant's motion to dismiss. *Id.* ¶ 24. At that hearing, the State, in response to the court's hypothetical query, asserted the joinder statute permitted the State to file additional charges every few months, based on various categories of illegal items seized at the time of the execution of a search warrant. *Id.* The supreme court labelled such contention "absurd

and unjust," noting the legislature intended the joinder statute "to prevent the successive prosecutions of multiple offenses described in the above-quoted colloquy." *Id.* ¶¶ 24-25.

¶ 64        The supreme court noted the handguns and cannabis were "discovered during the same search, at the same place, and at the same time." *Id.* ¶ 27. Thus, for all the foregoing reasons, the compulsory joinder statute required the State to charge the defendant with those offenses in a single prosecution because defendant committed a single act for its purposes. *Id.*

¶ 65        Subsequently, the appellate court similarly interpreted and applied the joinder statute, finding the statute required the prosecution of offenses related to the possession of marijuana and counterfeit currency in a single prosecution. *People v. Smith*, 2017 IL App (1st) 161231, ¶ 1. Upon searching defendant's home, officers there found cannabis, equipment used to make counterfeit currency, and counterfeit currency. *Id.* ¶ 3. On the day of the search and his arrest, defendant signed a statement admitting he had been manufacturing counterfeit currency for three months. *Id.* The State charged defendant with possession of cannabis, but it did not charge him with any offense related to counterfeiting, nor did any other agency. *Id.* ¶ 4. More than a year after pleading guilty to the marijuana offense, the State indicted defendant for manufacturing counterfeit currency based on defendant's statement made at the time of his arrest and the items found during the search the same day. *Id.* Defendant filed a motion to dismiss the indictment, which the trial court granted. *Id.* ¶ 5.

¶ 66        On appeal, the State again argued the cannabis and counterfeiting offenses were separate acts and the compulsory joinder statute did not require joinder. *Id.* ¶ 9. The appellate court reviewed approvingly and at length the supreme court's discussion in *Hunter,* and concluded permitting separate prosecutions contravened the purpose of the joinder statute as interpreted in *Hunter*. *Id.* ¶ 15. The First District did not believe the legislature "intended to reward prosecutors

for piecemeal litigation that harasses a defendant, as long as the State artfully pleads offenses discovered at the same time as separate acts committed at separate times." *Id.* The court, therefore, affirmed the trial court's dismissal of the counterfeiting charges. *Id.* ¶ 17.

¶ 67　　　　Here, too, we conclude the offense alleged in count II, whether the original or amended version, is the same act for purposes of compulsory joinder as the acts alleged in the prior prosecution. The acts were discovered at the same time and in the course of the same investigation. The charged acts in both cases, as well as the uncharged acts, (1) are entirely intermingled with each other, (2) involve the same victim, (3) occurred during the same time frame, and (4) were allegedly committed by defendant. The fact that the evidence proffered and discovery provided by the State, other than the testimony of Tewell, was the same in both cases further supports this conclusion.

¶ 68　　　　Additionally, the sex offenses herein bear more qualitative similarity to each other than do cannabis and firearm offenses, or cannabis and counterfeiting. If the latter type of offenses can constitute the same act for joinder purposes when discovered simultaneously, surely sex offenses committed against the same victim in the same time period and discovered in the same investigation qualify as well.

¶ 69　　　　Permitting the State to proceed on count II contravenes the purpose of avoiding piecemeal litigation, which underlies the joinder statute. We conclude the "new" allegations were part of "the same act" the State initially alleged in the prior prosecution. As well, this conclusion avoids the "hypertechnical interpretation," whereby each moment in time constitutes a separate act, rejected by the supreme court.

¶ 70　　　　　　　　　　　　*2. The State's Knowledge*

¶ 71    Having determined count II alleges the same act for joinder purposes as the offenses alleged in the prior prosecution, we must determine whether the State knew about the allegations underlying count II. Even the possibility of additional charges can constitute the requisite knowledge requiring the State to file such charges when a defendant is initially charged with others. *People v. Thomas*, 2014 IL App (2d) 130660, ¶ 24. In *Thomas*, the defendant was involved in a motor vehicle collision and taken to the hospital, where personnel drew his blood for treatment purposes. *Id.* ¶ 3. During the defendant's treatment, an emergency room nurse advised the investigating police officer, who was also present at the hospital, what the blood test disclosed about the defendant's blood alcohol level, from which the officer calculated a level significantly more than the legal limit. *Id.* ¶ 4. When the defendant was discharged from the hospital that night, he was arrested and charged with driving under the influence (DUI) based on impairment, but not based on his blood alcohol level. *Id.* ¶ 3. It was not until 13 months later that the State sought to file a DUI charge based on the blood alcohol level. *Id.* ¶ 6. Because the State knew of the possibility of the additional charge at the time of the filing of the initial charges, based on what the officer learned at the hospital that was later confirmed by the hospital records, compulsory joinder required the State to join the blood alcohol charge with the initially filed impairment-based charge. *Id.* ¶¶ 25, 29-30. Thus, the trial court properly dismissed the blood-alcohol-based charge. *Id.* ¶ 30.

¶ 72    Similarly, here, the record is clear the State possessed sufficient knowledge about the allegations underlying count II. First, the individual prosecutor who prepared the charges in both the previous prosecution and this matter, and who decided to dismiss the charges in the prior matter, testified at the hearing on the motion to dismiss he knew, at the time he filed the prior charges, of J.J.'s statements defendant caused his sex organ to have contact with her mouth or tongue. At that time as well, he testified he had watched the video of the CAC interview, reviewed

the transcript of J.J.'s testimony from the plenary OP hearing, and had reviewed a partial, if not full, police report. Second, when ruling on the motion to dismiss, the trial court found the State knew of such allegations at the time of the filing of the prior charges.

¶ 73　　　　　Third, as noted above, the State proffered no new evidence or provided discovery beyond what it did in the prior matter, other than evidence related to Tewell's interview. Finally, the chronology supports the finding the State knew of the allegations underlying count II at the time it filed the charges in the prior matter, to wit: at the initial CAC interview in July 2016, conducted by Riddle and viewed by a DCFS investigator and the detective, J.J. described a fingers-in-her-mouth incident. The next month, J.J. told Debra's close friend about defendant making her kiss his sex organ and described the fingers-in-her-mouth incident again, mentioning "snot water" coming out. In October 2016, Detective Stephens asked Debra about J.J.'s fingers-in-mouth comments. That same month (October 2016), DCFS issued its report, which the State received that month, which relates the fingers-in-the-mouth description and specifically concludes that meant defendant put his penis in J.J.'s mouth.

¶ 74　　　　　Also in October 2016, J.J. reported defendant put his fingers in her mouth to her counselor, who then reported that to DCFS. Then, at the plenary OP hearing in November 2016, J.J. testified two different times regarding defendant inserting his "fingers" into her mouth, which then "grew." The prosecutor testified he specifically based the initial charges, filed in December 2016 in case No. 16-CF-47, on the transcript of this hearing.

¶ 75　　　　　Throughout the course of the trial, the State also repeatedly asked witnesses about defendant's "fingers" and asked J.J. to explain what he did with them. During its closing argument, the State argued it was obvious J.J. was referring to defendant putting his penis in her mouth. The State has failed to identify anything to establish the oral sexual contact described at trial is different

than the contact the State knew about prior to the filing of the charges in the prior prosecution. We fail to discern any difference between the contact underlying count II and what the State knew previously.

¶ 76        We conclude the State knew about the allegations charged in count II, and the amended count, at the time of the filing of the charges in the previous matter, and therefore, the compulsory joinder statute required the State to charge this offense in the prior prosecution. The trial court should have granted the motion to dismiss as to count II, and thus, we vacate the conviction on count II.

¶ 77        We do not reach the double jeopardy issue, however, as we only consider constitutional questions if we cannot dispose of an issue on other grounds. *People v. White*, 2011 IL 109689, ¶ 144.

¶ 78        C. The Trial Court Should Not Have Permitted J.J. to Testify Remotely

¶ 79        Defendant asserts the trial court committed error by permitting J.J. to testify via CCTV, pursuant to section 106B-5(a)(2) of the Code (725 ILCS 5/106B-5(a)(2) (West 2018)), because the evidence was not sufficient to demonstrate the necessary prerequisites existed at the time of trial. We review such rulings for an abuse of discretion. *People v. Scott*, 284 Ill. App. 3d 336, 338 (1996).

¶ 80        Specifically, defendant argues the trial court's determination to permit such method of testimony was based on J.J.'s experience nearly three years before trial. Debra testified in the prior prosecution that J.J. had nightmares about defendant's attorney and had experienced bed-wetting for a short period, after the plenary OP hearing in 2016. Debra also testified about a picture J.J. drew of defendant with sharp and bloody teeth. Defendant notes there was no testimony J.J. had nightmares or bed-wetting for close to two and a half years prior to trial. We note Debra also

admitted defendant was not present in the courtroom when J.J. testified at the plenary OP hearing, and defendant was represented by different counsel at the OP hearing than he was in the trial court herein.

¶ 81        Section 106B-5 of the Code provides, in relevant part, as follows::

            "(a) In a proceeding in the prosecution of an offense of *** predatory criminal sexual assault of a child *** a court may order that the testimony of a victim who is a child under the age of 18 years *** be taken outside the courtroom and shown in the courtroom by means of a closed circuit television if:

            ***

            (2) the judge determines that testimony by the child victim *** in the courtroom will result in the child *** suffering serious emotional distress such that the child *** cannot reasonably communicate or that the child *** will suffer severe emotional distress that is likely to cause the child *** to suffer severe adverse effects." 725 ILCS 5/106B-5(a)(2) (West 2018).

¶ 82        Thus, there are two alternative findings that can support testimony by a child via CCTV. In short, the foregoing statutory excerpt provides such a method is proper if the trial court determines courtroom testimony will cause the child witness to suffer serious emotional distress that would interfere with the child's ability to communicate, or alternatively, that the child will suffer such distress and that distress will cause the child to suffer severe adverse effects.

¶ 83        We considered recently what evidence is required to permit a child's testimony via CCTV in *People v. Rajner*, 2021 IL App (4th) 180505. In *Rajner*, the child's therapist testified that, *inter alia*, the child would become overwhelmed in the courtroom if she had to testify and would not be able to communicate. *Id.* ¶ 27. The therapist (1) held both bachelor's and master's

degrees in social work, (2) had received significant training related to counselling trauma victims, (3) had been working as a therapist at an agency providing mental health treatment for children who had experienced trauma for several years prior to working with the child, and (4) had met with the child approximately 20 times for individual therapy. *Id.* ¶¶ 8-10. She reported during therapy that the child "avoided discussing the trauma she experienced in her life, including the reported sexual abuse." *Id.* ¶ 26. The therapist opined the child, "if she were required to testify in front of defendant inside the courtroom[,] *** would be unable to communicate and likely exhibit behaviors similar to those exhibited during the therapy sessions, such as getting up and walking away, changing the subject, and refusing to talk." *Id.* ¶ 14. Because the therapist's opinion was based on her experience with, and was specific to, the child, we found the therapist's testimony "more than sufficient" to serve as a basis for the trial court's finding pursuant to section 106B-5(a)(2) that the child would suffer severe emotional distress and not be able to reasonably communicate if she was required to testify with the defendant in the courtroom. *Id.* ¶¶ 27-28.

¶ 84        To permit a child to testify via CCTV in a child abuse matter, a trial court must make case-specific findings of necessity. *Maryland v. Craig*, 497 U.S. 836, 855 (1990); see also *People v. Van Brocklin*, 293 Ill. App. 3d 156, 168 (1997). To do so, the "trial court must hear evidence and determine whether use of the one-way closed circuit television is necessary to protect the welfare of the particular child witness who seeks to testify." *Id.* Further, to support the finding of necessity, the trial court must determine the child "would be traumatized, not by the courtroom generally, but by the presence of the defendant." *Craig*, 497 U.S. at 856; *Van Brocklin*, 293 Ill. App. 3d at 168. In short, as "long as a trial court makes such a case-specific finding of necessity, the Confrontation Clause does not prohibit a State from using a one-way closed circuit television procedure for the receipt of testimony by a child witness in a child abuse case." *Craig*, 497 U.S. at

860; *Van Brocklin*, 293 Ill. App. 3d at 168. Thus, the underlying evidence and a trial court's findings of necessity must be considered in light of the constitutional right to confront one's accusers.

¶ 85 The evidence here to support such findings of necessity is scant: Debra testified in the 2016 prosecution that after the plenary OP hearing, J.J. went back to bed-wetting and had nightmares about defendant's attorney for a short time. Defendant was not represented by that attorney herein. There was no evidence J.J. had nightmares or bed-wetting at any time since this period. And, significantly, defendant was not present in the courtroom for J.J.'s testimony in the OP hearing. Debra's conclusory statements the State offered are what we would expect from any mother. At most, Debra's testimony supports an inference that something at the OP hearing upset J.J., but that could be due to any number of causes.

¶ 86 In this matter, the State simply referred the trial court to the prior testimony and ruling, offered no evidence, and made no argument. Thus, there was no case-specific evidence or basis for a finding that defendant's presence would be traumatizing. We note, at the time of trial, J.J. would have been nearly three years older than when she testified at the OP hearing, presumably had continued for those years with therapy, and probably had met with the State and been exposed to the courtroom multiple times. As well, by this time, J.J. had not seen defendant in over three years.

¶ 87 Thus, due to the complete absence of evidence or case-specific findings establishing J.J. would be traumatized if she had to testify in the presence of defendant, in addition to the trial court taking judicial notice of the prior evidence and ruling, we find the court abused its discretion by permitting J.J. to testify via CCTV, pursuant to section 106B-5(a)(2) of the Code. Defendant's right pursuant to the confrontation clause is simply too important to be disposed of

based on a dearth of evidence. Debra made no observations like those made by the therapist in *Rajner*, and even if she had, significant time had passed since the OP hearing. Further, the circumstances at the OP hearing bear little similarity to what the trial court was faced with given that defendant was not present in the courtroom for J.J.'s testimony in the OP proceeding, and the attorney that J.J. had nightmares about was not the one who represented defendant below. The court's general conclusion J.J. was terrified of the courtroom was insufficient. For these reasons, we reverse defendant's conviction on count I and remand for further proceedings.

¶ 88        As we did above, we do not reach the constitutional challenge based on the confrontation clause because we resolve this issue based on the relevant statutory provision. *In re E.H.*, 224 Ill. 2d 172, 178 (2006) ("[C]ases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort.").

¶ 89        We acknowledge defendant also argues the trial court should not have admitted J.J.'s out-of-court statements, or evidence describing other uncharged acts of abuse or bad acts, but we decline to address that argument given our decision on the other grounds.

¶ 90                                    III. CONCLUSION

¶ 91        For the foregoing reasons, we reverse the trial court's judgment and remand for further proceedings as to count I. We vacate defendant's conviction as to count II.

¶ 92        Reversed in part and vacated in part; cause remanded.